RECORD NO. 14-6229

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

KIM M. STRICKLAND,

Personal Representative and Adminstrator
of the Estate of Aaron A. Cooper

*Plaintiff-Appellant,*

v.

JOHN JABE, Director,
Operations, Virginia Department of Corrections, *et al.,*

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ROANOKE

## OPENING BRIEF OF APPELLANT
## KIM STRICKLAND

Mary Lynn Tate
TATE LAW PC
16006 Porterfield Highway
Abingdon, VA 24210
276-628-5185
mltate@tatelaw.com

*Counsel for Appellant*

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-6229        Caption: Kim Strickland v. John Jabe

Pursuant to FRAP 26.1 and Local Rule 26.1,

Kim M. Strickland
(name of party/amicus)


who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                            ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:



3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                ☐ YES ☑ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
   If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Mary Lynn Tate _____   Date: ___ February 28, 2014 ___

Counsel for: Kim M. Strickland _____

## CERTIFICATE OF SERVICE
**************************

I certify that on ___ February 28, 2014 ___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ Mary Lynn Tate _____          ___ February 28, 2014 ___
        (signature)                                    (date)

- 2 -

# Table of Contents

Page

Corporate Disclosure

Table of Contents.................................................................................i

Table of Authorities.........................................................................iii

Jurisdictional Statement....................................................................1

Statement of the Issues Presented for Review..........................2

Statement of the Case .......................................................................2

Statement of Facts.............................................................................3

Summary of Argument....................................................................16

Argument ...........................................................................................18

   1.   Standard of Review .................................................................18

      A.   Review of grant of summary judgment is de novo............18

      B.   Strickland's evidence is assumed credible as forecast and viewed most favorably with all justifiable inferences .........................................................................18

      C.   The Fourth Circuit recognizes and should apply here the maxim that when "states of mind" are decisive as elements of claims and defenses summary judgment is seldom appropriate...........................................................20

2. The Eighth Amendment required Baird, Halsey, Mullins and Meade to protect Cooper from a known and dangerous homicidal prisoner ................................................................... 21

3. Strickland's evidence would let a reasonable juror conclude that Halsey, Baird, Mullins and Meade violated Cooper's Eighth Amendment right to protection from violence from other prisoners ........................................................................ 26

    A. Defendants were subjectively reckless by exposing Cooper to a known homicidal prisoner ............................ 26

    B. Determination of the defendants' states of mind is for the trier of fact and not disposition on summary judgment ........................................................................ 31

    C. Eliminating the serious risk of harm posed by Gleason was obvious and simple.................................................... 32

4. Defendants cannot escape their Eighth Amendment duty by blaming the victim ..................................................................... 33

Conclusion............................................................................................ 36

Request for Oral Argument.................................................................. 37

Certificate of Compliance .................................................................... 38

Certificate of Service ........................................................................... 39

# Table of Contents

## Cases

*Charbonnages De France v. Smith,*
  597 F.2d 406 (4th Cir. 1979) .................................................. 19, 20, 31

*Croley v. Matson Navigation Co.,*
  *434 F.2d 73* (5th Cir. 1970) ....................................................... 32

*De'Lonta v. Angelone,*
  330 F.3d 630 (4th Cir. 2003) ....................................................... 22

*Empire Electronics Co. v. United States,*
  311 F.2d 175 (2d Cir. 1962) ........................................................ 32

*Evans v. Tech. Applications & Serv. Co.,*
  80 F.3d 954 (4th Cir. 1996) ........................................................ 19

*Farmer v. Brennan,*
  511 U.S. 825 (1994) ........................................................... 21, 23, 32

*Hunt v. Cromartie,*
  526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) ................... 18

*MLC Automobile, LLC, v. Town of S. Pines,*
  532 F.3d 269 (4th Cir. 2008) ....................................................... 19

*Maracich v Spears,*
  675 F.3d 281 (4th Cir. 2012) ..................................................... 3, 18

*Odom v. S.C. Department of Correctional,*
  349 F.3d 765 (4th Cir. 2003) ....................................................... 21

*Shakka v. Smith,*
  71 F.3d 162 (4th Cir.1995) .......................................................... 23

iii

*Thompson v. ALCOA,*
276 F.3d 651 (4th Cir.2002) ............................................................. 19

*Williams v. Staples, Inc.,*
372 F.3d 662 (4th Cir.2004) ........................................................ 18-19

*Wilson v. Seiter,*
501 U.S. 294 (1991) ....................................................................... 22

## Statutes & Rules

42 U.S.C. § 1983 ............................................................................... 3

28 U.S.C. § 1291 ............................................................................... 4

Fed.R.Civ.P. 56(c)(2) ...................................................................... 29

Fed.R.App.P. 4(a)(1)(A) .................................................................. 4

## Jurisdictional Statement

Appellant Kim M. Strickland ("Strickland"), administrator of the Estate of Aaron A. Cooper ("Cooper") brought this action against the individual defendants[1] on behalf of her biological son for deprivation of civil rights under 42 U.S.C. § 1983. Cooper, while an inmate at Virginia's highest level maximum security facility, Red Onion State Prison (ROSP), was brutally murdered by strangulation by another inmate, Robert Gleason, on July 28, 2010. Strickland's claims were brought under the Eighth and Fourteenth Amendments of the United States Constitution. Strickland alleged four counts: defendants' deliberate indifference to substantial risk of serious harm for their failure to protect Cooper; supervisory liability; and civil conspiracy as well as state law claims for wrongful death.

On January 13, 2014, the district court granted all defendants' motions for summary judgment finding the evidence inadequate to show the defendants had a sufficiently culpable state of mind. App. p. 333, 337.

---

[1] Defendants remaining in this appeal are Meade, Mullins, Halsey, and Baird.

Strickland filed her notice of appeal on February 11, 2014 within the thirty days allowed by Federal Rule of Appellate Procedure 4(a)(1)(A). This Court has jurisdiction of the appeal under 28 USC § 1291, as the district court's order was final.

## Statement of the Issues Presented for Review

1. Did the district court err by finding that there was no evidence from which a reasonable fact finder could conclude that Defendants violated the decedent's Eighth Amendment rights when reasonable minds could differ regarding the evidence and credibility of the witnesses?

2. Did the district court err by granting Defendants' summary judgment when there were genuine and material issues of fact regarding Defendants' deliberate indifference and entitlement to qualified immunity?

## Statement of the Case

Strickland sued defendants as Administrator of the Estate of her son Aaron A. Cooper, an inmate in the Virginia Department of Corrections, on the ground that defendants failed to protect Cooper from violence at the hands of another inmate when he was killed by Robert Gleason on July 28, 2010.

Defendants filed motions for summary judgment arguing they were entitled to qualified immunity, conceding that the injury to Cooper was sufficiently serious, but contending that Strickland had failed to

prove the requisite culpability on the part of defendants to constitute deliberate indifference under the Eighth Amendment.

The district court granted all defendants' motions for summary judgment on all counts and entered judgment for them dismissing the case. Strickland appeals.

## Statement of Facts

For purposes of this appeal, the court must view the facts in the light most favorable to Strickland. *See Maracich v Spears,* 675 F.3d 281, 291 (4th Cir. 2012).

## The Facility

ROSP is a Security Level S facility, Virginia's most secure, housing its most dangerous and violent offenders. Cooper and Gleason were housed in the same pod of Building A in segregated, but not adjoining cells. The cells are separated by solid walls prohibiting all contact; inmates are able to talk through the vents. App. p. 37. They had been in the same pod for most of Cooper's time at ROSP.

All inmates in the ROSP segregation pods are a constant and serious risk of harm to themselves and each other and must be constantly visually monitored. App. pp. 172M-172N.

3

The recreation yard also has video camera surveillance. The correctional officer assigned to the Building A– 4, 5 and 6 pod control room provides 24 hour visual security over the 3 pods and the recreation yard. The control officer is also able to look out the pod door which has 2 large windows into the recreation yard. Continuous monitoring from the control room of the pods and the rec yard were required by the officer in the control room. Staffing policy did not require security staff to be present **on** the recreation yard during inmate recreation. App. p. 75.

Prior to Cooper's murder, rec yard inmate behavior included throwing feces and urine on each other and officers, spitting and attempting to use implements or weapons of any sort that could be put through the links, "virtually anything they could dream up." App. pp. 191, 192. The corrections officers were aware of these sorts of events. App. p. 195.

Inside frequently there were two or three empty cells in a pod. App. p. 280. First pod where Cooper and Gleason were housed was almost full at the time of murder. App. p. 281.

**Trading**

It was common practice for inmates and guards to trade. This was especially prevalent in the segregation pods where inmates' movement from cells to showers and recreation and back to their cells, required significant guard time, effort, focused attention and videotaping. App. pp. 90-94, 151, 192.

Mullins describes chronic understaffing and open positions in the segregated pods at ROSP. App. p. 311, 312. For example Mullins said it would take at least 6 corrections officers to do the work he and 2 others were supposed to do in one pod on a daily basis. App. p. 315, 316. There was not enough staff to securely pull the inmates who wanted to go to rec and shower and serve meals on a regular basis.

Examples of trading provided by Gleason include food, cookies, moving money on inmate's institution books, money to guards and others. Asked what he traded for help the day he murdered Cooper he references Officer Halsey's daughter's birthday and says "she needed something for her birthday." App. p. 91. Gleason testified he received a bag of tobacco every week using this practice. In turn, trading included inmates not going out of the cell for showers and recreation. App. p. 92.

The trading also included larger favors, passes or looking the other way to allow a break of prison rules. *Id.*

Halsey acknowledges that Gleason asked for favors. App. p. 151. She says "they all did." App. p. 151. She said inmates would ask for such things as something sent from their cell to another cell, an extra meal tray, a book, anything that they couldn't get themselves "they would try to ask you to get." App. p. 152.

Asked whether inmates offered things in return for those favors Halsey says "I usually just didn't fool with it." Asked whether other guards did she confirmed, "Oh, yeah." App. p. 153. Earlier trading reported at ROSP included drugs and a knife. App. p. 23.

**Aaron A. Cooper**

Cooper was 26 years old and serving a total active sentence of 34 years and 2 months for license revoked, driving without a license; failure to appear on a traffic summons; carjacking; robbery; and five counts of firearm use in commission of a felony. App. p. 32. He had attention deficit hyperactivity disorder (ADHD) and bipolar disorder, then untreated; defendants acknowledge his medical records indicate a

history of mental health treatment. App. p. 37. Cooper was biracial; African American and Caucasian. App. p. 18.

Cooper was in the custody of VDOC when he was transferred to ROSP from Sussex I State Prison on November 17, 2009, after receiving disciplinary offenses for setting fire to clothing and papers and throwing them into the pod. App. p. 36. Cooper admitted he did that hoping for transfer to escape gang assaults at Sussex.  App. p. 87.

**Robert Gleason**

Robert Gleason was "dangerous" among the most dangerous. Gleason was convicted of first degree murder on June 5, 2008 and became a VDOC inmate on July 22, 2008 to serve a life sentence. App. p. 37. On May 8, 2009 while at Wallens Ridge State Prison, Gleason murdered his cellmate, Harvey Watson, Jr. He was transferred to ROSP and placed in a segregation pod to await trial for that murder.

At Wallens Ridge on May 8, 2009, correctional officers found 63-year-old Watson bound, gagged, beaten and strangled. Gleason hid Watson's death for 15 hours: through two mandatory standing counts and two meals. App. p. 37.  Gleason told agents Watson was acting crazy but officials denied his requests to be moved.  App. p. 37.

Halsey, Baird, Meade and Mullins were all aware of the Watson murder App. p. 150, 207, 227, 237, 284, 302.

After transfer to ROSP in May 2009 Gleason pled guilty to the Watson murder  and pled to be executed. He said he would kill again if not sentenced to death. Gleason's stated desire to be executed and his threat to kill again were nationally publicized and discussed openly at ROSP. App. p. 38. Warden Ray admits he was well aware of the threats including those comments "to my staff". App. p. 54. Some staff took the threat personally. App. p. 68.

Gleason chose Cooper as his next victim. Gleason tells Cooper he wants help in a scheme to embarrass ROSP by attempting to injure him. App. p. 88.

Gleason arranged for another inmate to braid Gleason's sheets, which they exchanged without guard intervention in the shower. App. p. 89.

Gleason then made arrangements to have Cooper placed beside him in the recreation cages by trades with defendants Baird, Halsey, Mullins and Meade. App. p. 90. He states that others are also aware of the plan that involved Cooper, the braided sheets and the recreation

cages. App. p. 90, 91.   Gleason manipulated Cooper into believing that they are going to embarrass the prison with a stunt involving what Gleason will call a religious necklace to be measured with Cooper's help. App. pp. 91, 97, 98. Gleason says that Cooper has no knowledge that he intends to kill him. *Id.*

Gleason chose his rec cage and assigned rec cages for 4 specific inmates, Rodgers, Sparrow, and Darden, including Cooper. There were 5 cages. App. p. 123

**The Murder**

At about 1:43 p.m. on July 28, 2011 or one hour and fourteen minutes after Mr. Cooper was left in the recreation cage, corrections officers Heather Halsey and William Stanley entered the A4-5 Pod Segregation Recreation Yard and found Cooper, lying unconscious on the floor of the second (#2) recreation cage. Cooper was tied hanging by his neck, his back against the fencing that separates cage #1 and #2. A partially braided rope made of bed sheets, approximately 4 ft. long, was tied around his neck in a noose. The other end of the rope was tied off above his head on the fence common with Gleason's cage #1. His face was purple and he was dead. App. p. 39.

Meade and Mullins were the two officers that pulled Gleason from his cell, searched him and placed Gleason on the recreation yard. Meade and Mullins admit Gleason was the first inmate brought to the recreation yard, that he was placed in cage #1 of 5 cages; Gleason chose his cage. Three other inmates were brought to the rec yard and placed in cages directed by Gleason. Cooper was placed in the recreation yard last in cage #2 next to Gleason at approximately 12:29 p.m. Meade and Mullins exited the recreation yard shortly thereafter. App. p. 39.

Defendants admit Gleason is shown on video carrying a shirt or cloth behind his back in the presence of these correctional officers as he was entering the rec yard. App. p. 39. Gleason testified that it was in this shirt that he placed the braided sheets and that its presence was known to the officers. App. p. 90, 91.

ROSP's video camera recording on the rec yard camera shows the murder: Cooper is sitting back against the fence struggling, kicking his feet, and jerking his arms, while Gleason pulls the braided sheets choking him from behind. After Cooper appears to fall still, Gleason walks away from Cooper for a time. Seeing movement, goes back behind

Cooper and continues to strangle him, pulling upward on the sheets as Cooper's head moves up and down. App. p. 39.

**Defendants Baird, Halsey, Meade and Mullins**

Defendant Sgt. Tracy Baird (formerly Gilmore) was a Sergeant at ROSP on July 28, 2010. As a Sergeant, Baird provided security and supervision of adult offenders; supervised, monitored, and controlled the daily activities of staff and inmates. She was the supervisor of Halsey, Mullins and Meade and on duty the day Cooper was murdered. App. p. 35. Sgt. Baird was disciplined for this incident for failure to supervise her officers. App. p. 203. Mullins and Meade were disciplined for improper search of Gleason. App. p. 204, 205. Halsey was also disciplined. App. p. 147. Ofc. Burke, the control room officer, was not disciplined presumably because he was on his lunch break.

With the trade with Halsey for "something for her [daughter's] birthday," Gleason arranged with Halsey the inmates he wanted brought to the rec cages the day of Cooper's murder. According to Gleason they decide together to forego a list, have Gleason brought to the cages first and have him name to Officers Meade and Mullins those to be brought next. App. p. 123. Defendants Halsey, Meade and Mullins

11

were the only 3 officers on duty in building "A" the day of Cooper's murder plus Burke in the control room. App. p. 142. Mullins went on his lunch break immediately after the inmates were taken to the rec yard and Meade was called to "D" building to assist with property inventory. App. p. 144.

Halsey specifically recalls giving Officer Burke a break from the control room but does not recall the time. App. p. 143. Gleason describes seeing Halsey in the control room at the open window after all 5 inmates were placed in the rec yard the day of Cooper's murder. He testifies he held up his braided sheets to show her and she closed the window. App. p. 118.

Halsey was disciplined for the incident that result resulted in Mr. Cooper's murder for violation of the mandatory standing count procedure, seeing and counting all inmates: "standing, breathing, flesh" was required. Halsey did not go to the rec yard to count the 5 inmates, rather, she claims she checked off inmates if they were shown on cell door check sheets to be in the shower or rec yard, including Cooper, thereby reporting a false count. App. pp. 150, 151.

Halsey gave the control room officer his lunch break the day Cooper was murdered. App. p. 284.

Corrections Officer Meade had been employed at Red Onion for almost 12 years. App. p. 226. Meade had been briefed by superiors that Gleason was a dangerous individual upon his arrival at Red Onion and was aware of the murder at Wallens Ridge. App. p. 227, 228.

Meade assisted Mullins in the strip search and pulling of Gleason from his cell to be taken to the recreation cages. He was given the box of clothes to search while Meade searched Gleason's person. App. p. 240. The strip search includes having the inmate bend over and checking under, over and around the genitalia, searching for any indication of objects inserted in body cavities. He found no indication Gleason had anything on or in his body. App. pp. 240, 241.

Once the clothes were searched and the offender was inspected, the clothes were returned to the offender, with continuous eyes on the offender. They put their clothes back on, turned around, put their hands behind their back, and put their hands out of the cell so the officers can cuff them.

Once they are cuffed the control room officer is told to open their door. Before the door is opened the inmate is told to kneel on his knees. When the door is opened the officer puts leg irons on. The inmate is pulled up, and brought outside the cell. An officer then goes in the cell and does a walkthrough search of the cell; the other officer is outside the cell patting the inmate down. Both officers escort the inmate to the destination. App. p. 291.

Meade and Mullins encountered no one else during their movement of Gleason to the recreation yard. Meade examined the rec cage that Gleason was placed into and said there was nothing in the cage. App. p. 242.

After Gleason was placed in the recreation cage and the other 4 inmates were pulled and placed in the other cages Meade was called to building D to assist with a property inventory but did not consult with Sgt. Baird prior to leaving the building. App. p. 246.

Mullins performed the required physical strip search of Robert Gleason along with corrections Ofc. Brian Meade, before escorting him to the recreation yard.

After placing Cooper, last of the inmates in the rec cage, beside Gleason, Mullins went on his lunch break to his personal vehicle in the parking lot for one hour. App. pp. 284-285.  Meade, Halsey and Baird were not on lunch break at the same time. App. p. 286.

Mullins saw Gleason was carrying his long-sleeve burgundy shirt, in his hand as he was put on the rec yard. App. p. 305.

William Stanley, not a defendant and not implicated here, was disciplined because of the count procedure. App. p. 307.  Stanley came to assist Halsey with the count and blamed for the missing count. App. p. 308.

Though Burke was on duty in the control room that day Mullins admits he doesn't know who was there during Mullins' absence for lunch. App. p. 309.

Inconsistent with Baird and the defendant's Answer, Mullins claims that the window that looks out on the rec yard from the control room is so high, you cannot see in the rec yard; if they are in the back of the cage, you can see their feet, because the cameras are up so high you cannot visualize all the rec cage. App. pp. 309-310. He later admits one can see the full cage from the control room window. App. p. 310: 14-19.

## Summary of Argument

The murder of Aaron Cooper by Robert Gleason could not have occurred without the knowledge and reckless indifference or complicity of corrections officers Halsey, Baird, Meade, and Mullins.  Under Strickland's evidence, defendants Halsey, Baird, Meade and Mullins knew that Gleason was homicidal based on their awareness of his most recent murder of his cellmate Watson, his request to be executed and his threat to kill again if not executed.

Here the District Court gave decisive weight to the internally inconsistent and general denials of Corrections Officers Halsey, Baird (formerly Gilmore), Meade and Mullins. The Court discounted the testimony of Gleason, concluding incorrectly that the inmate's testimony was the "sole support" of Strickland's claim and "inadequate." **Believing** inmate Gleason that Meade, Mullins, Halsey and Baird knew his plan, assisted him, and traded with him, along with Strickland's other evidence is required by law and compels denial of Summary Judgment.

In addition uncontradicted physical evidence included the murder weapon---the braided rope of sheets found inside the cage around

16

Cooper's neck; the video of the murder; absence of control room intervention; and recreation cage placement. The testimony of Gleason, detailing the trades he made with defendants to take his weapon, arrange Cooper's recreation cage position and the absence of rec yard surveillance, is consistent with the physical evidence.

The district court improperly weighed the evidence and made credibility determinations adverse to Strickland including;

- incorrectly concluded that Gleason's deposition was the "sole support" for plaintiff's claims and gave it no weight;
- incorrectly determined, based on a selective record, that Gleason's testimony was "inadequate to support" defendants "sufficiently culpable state of mind".  App. p.333.

The District Court failed to consider and apply the Fourth Circuit maxim that militates against summary judgment in cases where "state of mind" is a decisive element of a claim or defense, especially important where, as here, direct testimony is likely to be self-serving.

To reach its conclusions the district court swept aside Strickland's evidence: direct, physical and circumstantial; rather than accepting the credibility of her evidence as forecast assumed. This evidence, forecast in a light most favorable to plaintiff and without adverse weight and

credibility determinations, requires reversal of the district court's judgment. Strickland is entitled to have a jury make these factual determinations.

## Argument

### 1. Standard of Review

### A. Review of grant of summary judgment is de novo.

The Court will review the district court's grant of defendants' motions for summary judgment under Rule 56 de novo. *See Maracich v Spears,* 675 F.3d 281, 291 (4th Cir. 2012).

### B. Strickland's evidence is assumed credible as forecast and viewed most favorably with all justifiable inferences.

On appeal the court will review the evidence in the light most favorable to Strickland. *See Id*. In this context, the district court's grant of summary judgment to defendants must reflect that it ***believed*** Strickland's evidence and drew *all justifiable inferences* in her favor." *Id. (*citing *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). In doing so the district court ***must not*** have made "credibility determinations or weigh[ed] the evidence." *Williams v.*

*Staples, Inc.,* 372 F.3d 662, 667 (4th Cir.2004) (citing *Thompson v. ALCOA,* 276 F.3d 651, 656 (4th Cir.2002)).

Strickland is entitled "to have the credibility of her evidence as forecast assumed, her version of all that is in dispute accepted, all internal conflicts in it resolved favorably to her, the most favorable of possible alternative inferences from it drawn in her behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered." See *Charbonnages De France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).

Only after a *scrupulous review of the entire record,* may the district court find that no reasonable jury could return a verdict for the non-moving party. *See Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

The burden is on the moving party to establish either the absence of a genuine issue of material fact or the absence of evidence to support the non-moving party's case. *MLC Auto., LLC, v. Town of S. Pines*, 532 F.3d 269, 273, 281 (4th Cir. 2008).

As provided by Fed.R.Civ.P. 56(c)(2), summary judgment should be granted only "if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

## C.    The Fourth Circuit recognizes and should apply here the maxim that when "states of mind" are decisive as elements of claims and defenses summary judgment is seldom appropriate.

The Fourth Circuit has long held that implicit in the "basic rules" regarding summary judgment "is a consequence, frequently expressed as a maxim, that summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of claim or defense." *Charbonnages De France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) (finding the matter of contract formation—"meeting of the minds"—was not properly resolved by summary judgment). (citations omitted.)

Because Strickland must prove the guards' "sufficiently culpable state of mind," this maxim militates against summary judgment. This standard is especially important where, as here, direct testimony is likely to be self-serving. *Id.*

**2.    The Eighth Amendment required Baird, Halsey, Mullins and Meade to protect Cooper from a known and dangerous homicidal prisoner.**

A reasonable jury would conclude from Strickland's evidence that Halsey, Baird, Mullins and Meade violated Cooper's Eighth Amendment right to protection from violence from other prisoners. The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners" and "to take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832, 833 (1994).

A valid claim under the Eighth Amendment requires proof of two elements. **First**, the deprivation "must be sufficiently serious." *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003) (internal quotation marks and citation omitted).

Defendants **concede** that Cooper's murder by Gleason meets this first element: "In this case, Defendants concede that Plaintiff has clearly established that Aaron Cooper suffered a serious injury as a result of Robert Gleason's assault on July 28, 2010. ECF No. 50, Defendants Memorandum In Support Of Motion For Summary

Judgment p. 9 of 22, page ID #112.  Defendants Meade, Mullins, Halsey and Baird joined in this concession.  App. p. 78.

**Second**, a prisoner must demonstrate that the prison official had a "sufficiently culpable state of mind." *Odom* (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Under the Eighth Amendment, "the requisite state of mind is one of deliberate indifference to inmate health or safety." *Id.* (internal quotation marks and citation omitted).

In *Farmer* the Supreme Court declared "[t]his case requires us to define the term "deliberate indifference," as we do by requiring a showing that the official was subjectively aware of the risk. *Id*. p. 829.

The Supreme Court then adopted "subjective recklessness as used in the criminal law" ... "as the test for "deliberate indifference" under the Eighth Amendment." *Id*. 840. Eight Amendment liability requires consciousness of a risk. *Id.*

In *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003), this Court used this language to describe claimant's burden: "[D]eliberate indifference entails something more than mere negligence... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  It requires

that a prison official **actually know of and disregard an objectively serious risk of harm.** *Id.* citing *Shakka v. Smith,* 71 F.3d 162, 166 (4th Cir.1995). (internal citations omitted.) (emphasis added.) Both elements are questions of fact that may be proven in the usual ways, including inference from circumstantial evidence. *Farmer* at p. 829.

The *Farmer* decision also set out particular parameters for application of the deliberate indifference standard. The reasoning of the district court incorrectly departed from these parameters when it relied on the fact that Cooper himself was unaware of the risk Gleason posed to him; and others discussed below. App. p. 332.

In failing to credit Strickland's evidence as forecast assumed the district court also departed from or failed to apply the following parameters for application of the deliberate indifference standard set out in *Farmer:*

- The term "deliberate indifference" would not, of its own force, preclude a scheme that conclusively presumed awareness from a **risk's obviousness.** *Id.*

- An Eighth Amendment claimant need not show that a prison official acted or failed to act believing that **harm** actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. *Id.* 842.

- **Purposeful, knowing conduct** as required for excessive physical force claims is **not necessary** to satisfy the *mens rea* requirement of deliberate indifference claims. *Id.* 836.

- A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the **risk was obvious**. *Id.* 842.

- Similarly, a factfinder may conclude that the official's **response** to a perceived risk was so **patently inadequate** as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances.

- Evidence showing that a substantial risk of inmate attacks was **"longstanding, pervasive, well-documented, or expressly noted by prison officials** in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus `must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* pp. 842, 843.

- With awareness of a substantial risk, the absence of a known specific or **likely target or specific perpetrator** will not permit a prison official to escape liability. *Id.* 843

- It does not matter whether the risk comes from a **single source or multiple sources.** *Id.*

- It does not matter if a prisoner faces an excessive risk for reasons **personal to him or** because **all prisoners** in his situation face such a risk. *Id.*

- A prisoner can establish exposure to a serious risk of harm by showing that he belongs to an **"identifiable group"** who are frequently singled out for violent attack. *Id*.

- The failure of a victim inmate to give **advance notice** of fear or suspected potential assault is **not dispositive**. *Id*. 842.

Dangerous and disease exposing behavior and physical attacks (including weapons) were longstanding risks of rec yard behavior noted by Sgt. Baird. She confirmed that those working under her who included Halsey, Meade and Mullins, were aware of this behavior.  App. p. 191.

There is no dispute that Cooper was biracial. Gleason describes animus by the defendants against Cooper saying it facilitated complicity in his plans. Cooper's belonging to an identifiable group frequently singled out for violent attacks evidence his unique exposure to excessive risk. These defendants were conscious of this risk under the evidence forecast.

### 3. Strickland's evidence would let a reasonable juror conclude that Halsey, Baird, Mullins and Meade violated Cooper's Eighth Amendment right to protection from violence from other prisoners.

Fully credited as forecast with all reasonable inferences, Strickland's evidence would let a reasonable juror conclude that Halsey, Baird, Mullins and Meade violated Cooper's Eighth Amendment right to protection from violence from other prisoners. Knowing Gleason's very recent homicide, plea for execution and threat to kill, these guards acted with deliberate indifference and *exposed* Cooper to a sufficiently substantial risk of serious danger to support this claim.

### A    Defendants were subjectively reckless by exposing Cooper to a known homicidal prisoner.

Defendants were subjectively reckless by exposing Cooper to Gleason, a known homicidal prisoner. Crediting Strickland's evidence as required, defendants had the knowledge, consciousness of a risk of serious harm and subjective recklessness to satisfy the deliberate indifference standard.

The murder of Aaron Cooper by Robert Gleason could not have occurred without the knowledge and reckless indifference or complicity of corrections officers Halsey, Baird, Meade, and Mullins.    Under

26

Strickland's evidence, defendants Halsey, Baird, Meade and Mullins knew that

- Gleason was homicidal based on their awareness of the Watson murder, his request to be executed and threat to kill again if not executed.
- While all inmates at ROSP were known to be the most dangerous, Gleason was especially "dangerous" based on superior's briefing acknowledged by Meade.
- Gleason wanted a false clean search in order to take a weapon— partially braided rope of sheets—to the recreation (rec) yard; these officers traded with him to arrange this. Video shows Gleason holding a shirt behind his back in the presence of Meade, Mullins and Halsey when entering the rec yard. App. p. 39.
- This weapon, made from bed sheets--- known to all the world as the most accessible weapon to inmates--- was also known to be frequently used to commit homicide or suicide in a prison setting.
- Gleason wanted Cooper in the rec cage beside him and other specific inmates in specific cages with him in the rec yard; these officers traded with him to arrange this.
- Inmates on the rec yard regularly created serious dangerous and objective risks of harm to others of multiple sorts including exposure to disease and physical assaults.

- Cooper was biracial; the subject of animus from the guards, and Gleason planned to do something to him with the guards' complicity.
-  The composition of the segregated pod inmate population where Cooper and Gleason were housed required visual surveillance 24 hours a day of their cells, yard, and showers.

Uncontradicted physical evidence included the murder weapon, the braided rope of sheets found inside the cage around Cooper's neck; the video of the murder; absence of control room intervention; and recreation cage placement. The testimony of Gleason, detailing the trades he made with defendants to take his weapon, arrange Cooper's cage position and the absence of rec yard monitoring, is consistent with the physical evidence.

Defendants admit that the murder was visible on the rec yard video and described it in detail yet the district court incorrectly relied on Mullins' testimony, though internally inconsistent, to the contrary. App. p. 39. Similarly, defendants admit in their Answer that video shows Gleason holding a shirt behind his back in the presence of Meade, Mullins and Halsey when entering the rec yard. App. p. 39.

The district court incorrectly finds that Gleason is the sole support for the trading practices. In fact Halsey acknowledges that favors are requested "all the time" and that officers engage in such trades. Asked whether she did she said, "I *usually* just didn't fool with it." She acknowledged it was against the rules. App. 153.

The district court discounted Gleason's affirmative statement that Halsey was looking out at the rec yard from the control room window when he arrived on the rec yard and held up the braided sheets for her to see; choosing instead to credit Halsey's statement that she "does not recall" seeing Gleason until she found Cooper's body. App. 326: Fn 7. Her inability to deny Gleason's statement under the circumstances is incredulous. Summary judgment standards require that Gleason be believed.

There are genuine and material issues to be decided by the factfinder that are at this stage required to be forecast in favor of Strickland:

1) Did Gleason as he testifies, trade with Baird, Halsey, Mullins and Meade in exchange for
   - carrying his weapon to the rec yard
   - directing Cooper placed beside him in the rec cages
   - no monitoring from the control room?

2) Does the video showing Gleason carrying a shirt or other cloth behind his back to the rec cage in the presence of Halsey, Meade

and Mullins permit the inference that he is carrying the murder weapon, not taken from him when he was searched; and if not, how was the weapon obtained and used to murder Cooper?

3) Does the video of the murder taken by the rec yard camera show and permit the inference that the murder was visible to any onlooker or viewer of the video monitor and from the control room window?

4) Does the absence of control room intervention during and after the strangulation, approximately 75 minutes, permit the inference of participation, complicity or reckless indifference to a known serious risk?

5) Does the fact that Baird, Halsey, Mullins and Meade were all disciplined for the incident of Cooper's murder permit an inference that all were recklessly involved in the events that made the murder possible?

6) Does conscious placement of a homicidal prisoner with others constitute known reckless indifference?

7) Does the physical, circumstantial and testimonial evidence taken together as a whole, as well as the weight and credibility of such evidence, permit a reasonable juror to find for plaintiff?

Uncontradicted physical evidence included the murder weapon---the braided rope of sheets found inside the cage around Cooper's neck; the video of the murder; absence of control room intervention; and recreation cage placement. The testimony of Robert Gleason, detailing the trades he made with defendants to take his weapon, arrange

30

Cooper's recreation cage position and the absence of rec yard monitoring, is consistent with the physical evidence.

A trier of fact could easily find that Baird, Halsey, Meade and Mullins had actual knowledge of the serious risks posed by Gleason to all who came near him under these facts.

## B. Determination of the defendants' states of mind is for the trier of fact and not disposition on summary judgment.

Determination of the defendants' states of mind, where state of mind, as here, is a decisive element of the claim, is for the trier of fact and not disposition on summary judgment.

Because Strickland must prove the defendants' "sufficiently culpable state of mind," the district court was required but failed to consider and apply the maxim recognized in the Fourth Circuit that militates against summary judgment in such cases. Summary judgment is "seldom appropriate in cases wherein particular states of mind are decisive as elements of claim or defense." See *Charbonnages De France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) (finding the matter of contract formation—"meeting of the minds"—was not properly resolved by summary judgment). This standard is especially important where, as here, direct testimony is likely to be self-serving. *Id.*

31

This Court describes the underlying basis for this maxim as "a general perception that whether as a matter of fact any particular state of mind exists can seldom be considered to be beyond reasonable dispute because this depends entirely upon the conflicting inferences to be drawn from evidence so likely to be circumstantial or, if direct, self-serving". *Id.* citing *Croley v. Matson Navigation Co., 434 F.2d 73*, 75 (5th Cir. 1970) (importance of "demeanor" evidence); *Empire Electronics Co. v. United States,* 311 F.2d 175, 179-80 (2d Cir. 1962) (reliance on circumstantial evidence). This reason alone should warrant reversal and remand for trial.

## C.   Eliminating the serious risk of harm posed by Gleason was obvious and simple.

Eliminating the serious risk of harm posed by Gleason was obvious and simple. Avoidance of this substantial risk required little or no effort. Gleason could have been placed in a cage on the rec yard with no one adjoining him. Instead defendants chose to be absent for Gleason's rec time. Consistent with the parameters in *Farmer,* defendant's total absences forecasts their knowledge and consciousness of the obvious risk of leaving a homicidal prisoner unmonitored in the rec cage. Baird's discipline for supervisory failures, not improper search

of Gleason as the district court states, forecast confirmation that absence of rec yard surveillance was contrived and consciously overlooked by Baird.

## 4. Defendants cannot escape their Eighth Amendment duty by blaming the victim.

Under these facts the defendants cannot escape Eighth Amendment duties by blaming the victim. Though not assigned as a specific ground for summary judgment by defendants, they argued orally that Cooper was responsible for his own death by permitting Gleason to place the sheets around his neck. The district court notes that "Cooper even allowed Gleason to place the noose around his neck and without his acquiescence, the risk of harm could not have existed." App. p. 332. This is wrong. The risk of harm was the homicidal prisoner beside Mr. Cooper.

The district court obviously blames Cooper for his response to Gleason's request to help measure the braided sheet for a religious necklace. To do so is to ignore the underlying corrections and facility policy requiring 24-hour surveillance of all these inmates to prevent them harming themselves and others. It also ignores the factual reality

of the obvious homicidal nature of Gleason and his announced plan to kill, known to all defendants and nationally publicized.

Many scenarios could have achieved the same result. For example the 3 inmates on the opposite side of Cooper from Gleason could have started throwing feces and urine on Cooper, a common occurrence in the rec yard, providing the opportunity for Gleason to offer his sheets for cleaning or cover. Weaving sheets through the cage holes and playing pulling games could have achieved a similar result.

All that was required was the homicidal prisoner using obviously available means to kill again. Cooper was entitled to be protected from Gleason. Gleason had previously obtained Watson's acquiescence telling him he was being bound and gagged with sheets and socks as part of their escape attempt.

These defendants concede that all the inmates in Cooper's segregation pod required 24-hour surveillance. Among the reasons for that surveillance was the risk of an inmate harming himself. No less dangerous is the lack of judgment of a 26 year old mentally ill inmate, the victim of slurs and prior attacks, who, in a population of predators, could be manipulated, used, threatened, and blackmailed. Gleason

testified that he had obtained Cooper's mother's address and location and used it as a threat saying he had people on the outside who could get to her...have her killed." App. p. 122. In this context the Eighth Amendment requires that Cooper be protected.

But for the reckless indifference or complicity of these 4 defendants, Cooper would not have been beside Gleason in a rec cage. Crediting Gleason's testimony and the other evidence of defendant's complicity, Gleason would not have had the rope or the opportunity to kill Cooper without Defendant's reckless indifference or complicity and the control room surveillance would have provided an opportunity for intervention and saving Cooper's life.

The fact that all 4 defendants are absent from the scene for longer than the hour of recreation and there is no control room coverage during that entire time permits the inference it is not merely coincidental but reckless complicity when considered with the entire record.

From all the evidence developed thus far a reasonable juror could find that Baird, Halsey, Meade and Mullins violated Cooper's Eighth Amendment rights even discounting Gleason's accusation of trades and complicity.

## Conclusion

The Court should reverse the district court's grant of summary judgment to defendants and remand the case to the district court for further proceedings.

**Kim M. Strickland**

By: /s/ Mary Lynn Tate

Mary Lynn Tate, Esq. (VSB# 16085)
Tate Law, PC
16006 Porterfield Highway
Abingdon, Virginia 24210
T: 276-628-5185
F: 276-628-5045
mltate@tatelaw.com
*Counsel for Plaintiff-Appellant*

## Request for Oral Argument

Kim M. Strickland requests oral argument. The issues in this case involve the evolution of civil rights law and prisoner rights under the Eighth Amendment. These issues are extremely important to our public officials involved in our penal and correctional systems and equally important to the rights of individuals and those concerned about the conditions of confinement in our penal institutions.

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief complies with the Type-volume limitation of Fed. R.
App. 32(a)(7)(B) because:

   The word count of this brief is <u>6,887</u>.

2. This brief complies with the typeface requirements of Fed. R. App.
P. 32(a)(5) and the type style requirements of Fed. R. App. P.
32(a)(6) because:

   This brief has been prepared in a proportionally spaced
   typeface using
   <u>Micro Soft Word, Century Schoolbook, 14 point</u>.

July 24, 2014

## CERTIFICATE OF SERVICE

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this July 24, 2014, filed the required copies of the foregoing Brief of Appellant in the Office of the Clerk of the Court, via hand delivery and have electronically filed the Brief of Appellant using the Court's CM/ECF system which will send notification of such filing to the following counsel:

Trevor Stephen Cox
Office of the Attorney General
900 East Main Street
Richmond, VA 23219-0000
tcox@oag.state.va.us

Cameron Scott Bell
PENNSTUART
208 East Main Street
P. O. Box 2288
Abingdon, VA 24212-2288
cbell@pennstuart.com

Henry Keuling-Stout
KEULING-STOUT, PC
125 Clinton Avenue, East
P. O. Box 400
Big Stone Gap, VA 24219-0000
keulingstout@gmail.com

/s/
Mary Lynn Tate