RECORD NO. 14-6229

IN THE

# United States Court of Appeals
### FOR THE FOURTH CIRCUIT

KIM M. STRICKLAND,

Personal Representative and Administrator of the Estate of Aaron A. Cooper,

*Plaintiff – Appellant,*

v.

HEATHER HALSEY, Corrections and Floor Officer, Red Onion State Prison;
TRACY C. (GILMORE) BAIRD, Building Sergeant, Red On- ion State
Prison; BRIAN MEADE, Corrections Officer, Red Onion State Prison;
ROBERT MULLINS, Corrections Officer, Red Onion State Prison;

*Defendants – Appellees,*

and

HAROLD W. CLARKE, Director, Virginia Department of Corrections;
JOHN JABE, Director, Operations, Virginia Department of Corrections; JOHN S.
GARMAN, Regional Director, Virginia Department of Corrections; TRACY
RAY, Warden, Red Onion State Prison; RICHARD ROWLETTE, Assistant
Warden and Incident Commander, Red Onion State Prison; LESLIE FLEMING,
Major, Chief of Security, Red Onion State Prison; TRAVIS MCCOY, Lieutenant,
Shift and Watch Commander, Red Onion State Prison; TONY ADAMS, Sergeant,
Instructional Investigator, Red Onion State Prison; JAMES BENTLEY,
Intelligence Officer, Red Onion State Prison; J. RICK WIANDT, MSA,
Investigator, Inspector General, Virginia Department of Corrections; L.
FLEMING, (male) Lieutenant, Red Onion State Prison; FIRST NAME
UNKNOWN BALL, (Female) Corrections Officer, Control Booth, Red Onion
State Prison; THREE UNKNOWN CORRECTIONAL OFFICERS,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ROANOKE

## RESPONSE BRIEF OF APPELLEES

Henry S. Keuling-Stout, Esq. (VSB # 15289)
KEULING-STOUT, P.C.
125 Clinton Avenue East
Big Stone Gap, Virginia 24219
(276) 523-1676
Email: keulingstout@gmail.com
*Counsel for Defendants-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-6229__        Caption: __Kim Strickland v. John Jabe__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Heather Halsey, Corrections Officer, Red Onion State Prison, at time of incident__
(name of party/amicus)

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                              ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Henry Keuling-Stout                    Date:  3/26/2014

Counsel for: Heather Halsey

## CERTIFICATE OF SERVICE
*****************************

I certify that on _____3/26/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Mary Lynn Tate
Tate Law PC
16006 Porterfield Highway
Abingdon, Virginia 24210
Telephone: (276) 628-5185
Fax: (276) 628-5045
mltate@tatelaw.com
Counsel for Appellant

Cameron Scott Bell
Penn Stuart & Eskridge
P.O. Box 2288
Abingdon, Virginia 24212-2288
Telephone: (276) 628-5151
Fax: (276) 628-1730
cbell@pennstuart.com
Counsel for Appellee Travis McCoy

/s/Henry S. Keuling-Stout                          3/26/2014
        (signature)                                   (date)

- 2 -

Trevor S. Cox
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
Telephone: (804) 786-7704
Fax: (804) 371-0200
tcox@oag.state.va.us
Counsel for Appellee John Jabe,
John S. Garman, Tracy Ray,
Leslies Fleming, Robert Rowlette,
Lafayette Fleming, James Bentley,
J. Rick Wiandt, and Tony Adams

Cameron Scott Bell
Penn Stuart & Eskridge
P.O. Box 2288
Abingdon, Virginia 24212-2288
Telephone: (276) 628-5151
Fax: (276) 628-1730
cbell@pennstuart.com
Counsel for Appellee Travis McCoy

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-6229__    Caption: __Kim Strickland v. John Jabe__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Tracy (Gilmore) Baird, Corrections Officer at Red Onion State Prison at time of incident__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                          ☐YES ☑NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
    If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Henry Keuling-Stout        Date:    3/26/2014

Counsel for: Tracy (Gillmore) Baird

## CERTIFICATE OF SERVICE
****************************

I certify that on    3/26/2014    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Mary Lynn Tate
Tate Law PC
16006 Porterfield Highway
Abingdon, Virginia 24210
Telephone: (276) 628-5185
Fax: (276) 628-5045
mltate@tatelaw.com
Counsel for Appellant

Cameron Scott Bell
Penn Stuart & Eskridge
P.O. Box 2288
Abingdon, Virginia 24212-2288
Telephone: (276) 628-5151
Fax: (276) 628-1730
cbell@pennstuart.com
Counsel for Appellee Travis McCoy

/s/ Henry Keuling-Stout                3/26/2014
(signature)                           (date)

- 2 -

Trevor S. Cox
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
Telephone: (804) 786-7704
Fax: (804) 371-0200
tcox@oag.state.va.us
Counsel for Appellee John Jabe,
John S. Garman, Tracy Ray,
Leslies Fleming, Robert Rowlette,
Lafayette Fleming, James Bentley,
J. Rick Wiandt, and Tony Adams

Cameron Scott Bell
Penn Stuart & Eskridge
P.O. Box 2288
Abingdon, Virginia 24212-2288
Telephone: (276) 628-5151
Fax: (276) 628-1730
cbell@pennstuart.com
Counsel for Appellee Travis McCoy

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-6229          Caption: Kim Strickland v. John Jave

Pursuant to FRAP 26.1 and Local Rule 26.1,

Brian Meade, Corrections Officer, Red Onion State Prison
(name of party/amicus)


_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                             ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                 ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Henry Keuling-Stout                    Date:        3/26/2014

Counsel for: Brian Meade

## CERTIFICATE OF SERVICE
****************************

I certify that on _____3/26/2014_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Mary Lynn Tate
Tate Law PC
16006 Porterfield Highway
Abingdon, Virginia 24210
Telephone: (276) 628-5185
Fax: (276) 628-5045
mltate@tatelaw.com

Cameron Scott Bell
Penn Stuart & Eskridge
P.O. Box 2288
Abingdon, Virginia 24212-2288
Telephone: (276) 628-5151
Fax: (276) 628-1730
cbell@pennstuart.com
Counsel for Appellee Travis McCoy

/s/ Henry Keuling-Stout                                3/26/2014
_____                          _____
       (signature)                                        (date)

Trevor S. Cox
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
Telephone: (804) 786-7704
Fax: (804) 371-0200
tcox@oag.state.va.us
Counsel for Appellee John Jabe,
John S. Garman, Tracy Ray,
Leslies Fleming, Robert Rowlette,
Lafayette Fleming, James Bentley,
J. Rick Wiandt, and Tony Adams

Cameron Scott Bell
Penn Stuart & Eskridge
P.O. Box 2288
Abingdon, Virginia 24212-2288
Telephone: (276) 628-5151
Fax: (276) 628-1730
cbell@pennstuart.com
Counsel for Appellee Travis McCoy

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-6229        Caption: Kim Strickland v. John Jabe

Pursuant to FRAP 26.1 and Local Rule 26.1,

Robert Mullins, Corrections Officer, Red Onion State Prison, at time of incident
(name of party/amicus)


who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                          ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                               ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Henry Keuling-Stout                    Date: _____3/26/2014_____

Counsel for: Robert Mullins

## CERTIFICATE OF SERVICE
***************************

I certify that on _____3/26/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Mary Lynn Tate
Tate Law PC
16006 Porterfield Highway
Abingdon, Virginia 24210
Telephone: (276) 628-5185
Fax: (276) 628-5045
mltate@tatelaw.com
Counsel for Appellant

Cameron Scott Bell
Penn Stuart & Eskridge
P.O. Box 2288
Abingdon, Virginia 24212-2288
Telephone: (276) 628-5151
Fax: (276) 628-1730
cbell@pennstuart.com
Counsel for Appellee Travis McCoy

/s/ Henry Keuling-Stout                         3/26/2014
_____            _____
(signature)                                      (date)

Trevor S. Cox
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
Telephone: (804) 786-7704
Fax: (804) 371-0200
tcox@oag.state.va.us
Counsel for Appellee John Jabe,
John S. Garman, Tracy Ray,
Leslies Fleming, Robert Rowlette,
Lafayette Fleming, James Bentley,
J. Rick Wiandt, and Tony Adams

Cameron Scott Bell
Penn Stuart & Eskridge
P.O. Box 2288
Abingdon, Virginia 24212-2288
Telephone: (276) 628-5151
Fax: (276) 628-1730
cbell@pennstuart.com
Counsel for Appellee Travis McCoy

## TABLE OF CONTENTS

Corporate Disclosure Statements

Table of Authorities ...................................................................iii

Jurisdictional Statement ............................................................ 1

The Statement of Issues Presented for Review ......................... 2

Statement of the Case ............................................................... 3

Statement of Facts .................................................................... 4

Summary of Argument ............................................................. 17

Argument ................................................................................. 29

    A.   Summary Judgment Requirements ..................................... 29

    B.   The Quantum and Quality of Proof, the Significant, Affirmative, and Probative, and Concrete Evidence Necessary for the Plaintiff to Defeat the Defendants' Motion for Summary Judgment ............................................ 33

        1.   The Plaintiff Must First Show That Inmate Cooper Was Incarcerated Under Conditions Posing a Substantial, Excessive Risk of Serious Harm ............................................................................ 33

        2.   The Plaintiff Must Show that the Defendant Prison Officers Knew that Inmate Cooper was Being Incarcerated under Conditions Posing a Substantial/Excessive Risk of Serious Harm ............. 43

3.  The Plaintiff Must Show Evidence that the Defendant Prison Officers Actually Drew the Inference that Cooper was in an Excessive Risk Incarceration Condition .................................................. 47

4.  Even Obviousness of Prison's Excessive Risk Condition is Not Conclusive of An Eighth Amendment Violation .................................................. 48

C.  Conspiracy ........................................................................ 49

D.  There is No Evidence to Support Plaintiff's Assertions ....... 51

E.  Cruel and Unusual Self-Punishment .................................... 56

F.  Qualified Immunity ........................................................... 58

Conclusion .................................................................................... 61

Certificate of Compliance ............................................................... 62

Certificate of Filing and Service ..................................................... 63

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby,*
  477 U.S. 242 (1986) ............................................................. 28, 31, 32

*Arndt v. Russillo,*
  343 S.E.2d 84, 231 Va. 328 (Va. 1986) ............................................. 57

*Charbonnages De France v. Smith,*
  597 F.2d 406 (4th Cir. 1979) ........................................................... 30

*Croley v. Matson Navigation Co.,*
  434 F.2d 73 (5th Cir. 1971) ............................................................. 30

*Empire Electronics Co. v. United States,*
  311 F.2d 175 (2d Cir. 1962) ............................................................. 30

*Farmer v. Brennan,*
  511 U.S. 825 (1994) ................................... 28, 31, 33-35, 42-45, 48-49

*Gleason v. Comm.,*
  726 S.E.2d 351 (VA 2012) ........................................................... 7, 12

*Grayson v. Peed,*
  195 F.3d 692 (4th Cir. 1999) ..................................................... 46, 58

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ....................................................................... 59

*Hinkle v. City of Clarksburg, W. Va.,*
  81 F.3d 416 (4th Cir.   1996) ..................................................... 49, 50

*Hunt v. Cromartie,*
  526 U.S. 541, 119 S.Ct. *1545*, 143 L. Ed. 2d 731 (1999) ............... 30

*Johnson v. Rankin*,
 Case No. 12-1414 (4th Cir. December 2, 2013) ................................57

*Maciariello v. Summer*,
 973 F.2d 295 (4th Cir. 1992) ...........................................................59

*Malley v. Briggs*,
 475 U.S. 335 (1986) ..........................................................................59

*Maracich v. Spears*,
 675 F.3d 281 (4th Cir. 2012) ...........................................................30

*Odum v. S.C. Department of Corrections*,
 349 F.3d 765 (4th Cir. 2003) ...........................................33, 41-44, 47

*Parrish Ex rel Lee v. Cleveland*,
 372 F.3d 294 (4th Cir. 2004) ...........................................................58

*Pearson v. Callahan*,
 555 U.S. 223 (2009) ..........................................................................33

*Perry v. Kappos*,
 Case No. 11-1476 (4th Cir. 2012) .................................................53-55

*Short v. Smoot*,
 436 F.3d 422 (4th Cir. 2006) ...........................................................59

*Thompson v. ALCOA*,
 *276* F.3d *651* (4th Cir. 2002) ...........................................................30

*Williams v. Staples, Inc.*,
 372 F.3d 662 (4th Cir. 2004) ...........................................................30

## STATUTES

28 U.S.C. §1291.................................................................................1
28 U.S.C. §1343(a)(3).........................................................................1
28 U.S.C. § 1367(a) ...........................................................................1

42 U.S.C. § 1983.................................................................. 1, 57

## CONSTITUTION

Fourth Const. amend............................................................. 57
Eighth Const. amend.................................................28-30, 35, 45-46, 48

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

Record No. 14-6229
2:12-cv-00019-JPJ-PMS

_____

KIM M. STRICKLAND,                                    )
    Plaintiff-Appellant,                          )
                                 )
v.                                                    )
                                 )
                                 )
HAROLD W. CLARKE, et al.                              )
                                 )
    Defendants-Appellees                          )

## Jurisdictional Statement

The District Court had subject matter jurisdiction over Count I (deliberate indifference of a substantial risk of serious harm), Count II (supervisory liability for Count I), and Count III (conspiracy to violate Civil Rights related to Count I) pursuant to 28 U.S.C. §1343 (a) (3) which grants jurisdiction over cases arising over 42 U.S.C. § 1983, andCount IV (a pendent state claim for wrongful death) arose under Virginia law). The District Court has jurisdiction over the Virginia wrongful death claim pursuant to 28 U.S.C. § 1367 (a).

The Fourth Circuit has jurisdiction over the  appeal under 28 U.S.C. §1291. The District Court entered an Opinion and Final Order as

to each of the Four Counts on January 13, 2014. JA 322 and 337. The District Court determined as to Count I that the plaintiff had not produced evidence of the defendants' conduct such that a reasonable fact finder could conclude that the defendants inferred the existence of a substantial risk of harm to Cooper while placed in the recreation cage. And second that there was no supervisory liability upon the defendants (no longer part of this case) where there was no showing that any of them had a hand in the alleged injury to Mr. Cooper. The Court also dismissed the third Count alleging civil conspiracy, finding no evidence of a mutual understanding to accomplish a common and unlawful plan. The wrongful death Virginia state law claim, Count IV, was dismissed, Counts I through III being dispositive of Count IV.

## The Statement of Issues Presented for Review

The Defendants submit that a better characterization of the issues presented for review is this:

1. Did the district court err by finding that inmate Cooper was not incarcerated under conditions posing a substantial or excessive risk of serious harm when he was housed in a segregated recreation cage and

that none of the defendants actually knew of a substantial risk and disregarded the evidence of it?

2. Did the district court err by granting defendants' Summary Judgment Motion when the alleged genuine and material issues of fact as to defendants' deliberate indifference and entitlement to qualified immunity where speculation and inferences without a sound justifiable evidentiary foundation?

### Statement of the Case

The plaintiff's statement of the case is accurate. It does though need to be supplemented as follows:

The Complaint in the case was filed on July 27, 2012. JA 16. The defendants filed an Answer on December 28, 2012. JA 30. Defendants filed a Motion for Summary Judgment which addressed the issue of requisite culpability and addressed the most important underlying issue in a Eighth Amendment case, that being the actual existence of a substantial risk of serious harm to Mr. Cooper in the segregated rec area cage. The Memorandum in Support of Defendants' Motion for Summary Judgment is document 50 described at JA 10, filed on July 24, 2013.

## STATEMENT OF FACTS

1. Mr. Cooper, an inmate, who was incarcerated at Red Onion State Prison, died on July 28, 2010. He was 26 years old and serving a total active sentence of just in excess of 34 years. See Joint Appendix (JA) at 32. Defendant Tracy Gilmore (Baird) was a sergeant at Red Onion Prison. Her duties were to provide security and supervision of adult offenders. Defendant Heather Halsey was a corrections officer at Red Onion who also provided security and supervision of adult offenders. Defendants Brian Meade and Robert Mullins were also corrections officers at Red Onion with the same responsibilities as Defendant Heather Halsey. JA 35, 36. (Defendants' Answer)

2. Robert C. Gleason, Jr. was housed in the same pod but not cell as Mr. Cooper on February 22-April 2, 2010 and from April 21-July 28, 2010. Mr. Gleason murdered his cellmate Harvey Watson, Jr. at Wallens Ridge State Prison prior to coming to Red Onion Prison. JA 37. (Defendants' Answer)

3. Defendant Meade was one of two officers who placed Mr. Gleason in the recreation yard at the Red Onion Prison on July 28, 2010. A video of the recreation yard on July 28, 2010 shows Mr. Gleason

4

carrying a shirt behind his back in the presence of correctional officers. He was placed, by defendants Meade and Mullins in the first cage on the left. Mr. Cooper was placed in the recreation yard in the last cage next to Mr. Gleason's cage at approximately 12:29 P.M. on July 28, 2010. JA 39. (Defendants Answer)

4. The video (seen only after the incident, JA 60) indicates that Mr. Cooper turned his back to Mr. Gleason and sat in the floor with Mr. Cooper's back against the fence. Mr. Cooper seemed to appear to be struggling while Mr. Gleason was behind Mr. Cooper. The video recording also indicates that Mr. Gleason walked away from Mr. Cooper and later moved back behind Mr. Cooper and appeared to be pulling upward as Mr. Cooper's head appeared to be moving up and down. JA 39. (Defendants Answer)

5. There is no "video room" at Red Onion for purposes of observing offenders on the recreation yard. JA 58, paragraph 5. The Intel Office has access to live and recorded video footage; however no staff person is posted to monitor live videos. JA 60, paragraph 5. (Leslie Fleming Affidavit)

5

6. If any inmate has a problem with another inmate or fears for his life for another inmate there are multiple ways to report the fear to the staff. JA 60-61, paragraph 7 and JA 64, paragraph 8. (Leslie Fleming Affidavit)

7. Inmates are not called in any particular order for the recreation yard. JA 63. (Lafayette Fleming Affidavit)

8. The correctional officer assigned to the control room provides visual security over three pods and the recreation yard. The control officers are also able to look out the pod door which has two large windows into the recreation yard. There is no additional tower used for surveillance over the recreation yard and no video room for purposes of observing offenders on the recreation yard. And on July 28, 2010 staffing policy did not require security staff to be present on  the recreation yard during offender recreation. JA 63, paragraph 5. (Lafayette Fleming Affidavit)

9.  Mr. Cooper never complained to the Lieutenant Shift and Watch Commander that he, Cooper ,feared for his life or was in danger from Mr. Gleason or that he was having any sort of problems with Mr. Gleason. If such a Complaint had made steps would have been taken to

separate Mr. Cooper and Mr. Gleason and Mr. Cooper's complaint would have been investigated. JA 77. (former defendantTravis McCoy Affidavit)

10. Mr. Gleason knew himself that he would kill again and assumed that everybody knew it <u>because of what he had said in court</u> [1], what was on the news, and on the Internet. JA 85. (Gleason)

Nowhere in the record does Gleason state that he told defendants Baird, Meade, Mullins, Halsey (or anyone else before the December 21, 2010 Court hearing) that he was going to kill or harm Cooper or anyone else at the Red Onion Prison.

11. Mr. Gleason was going to help Mr. Cooper get out of a gang but Mr. Gleason required that Mr. Cooper not tell anybody about Mr. Gleason helping get Cooper out of the gang. JA 86,87. But then Mr. Gleason started telling everybody what was going on . JA 87 (Gleason).

12. Inmate Gleason comes up with the idea about putting a noose around Mr. Cooper's neck. When inmate Cooper messed up, inmate Gleason decided that he was going to kill inmate Cooper. Cooper just

---

[1] The Court hearing was on December 21, 2010, close to five months after the murder of Mr. Cooper. *Gleason v. Comm., 726 S.E. 2d 351, 352 (VA 2012)* , a case to which the District Court makes reference in its Opinion. JA 324, fn 2.

wouldn't shut up. Inmate Gleason thereafter pretends to make up with Cooper and become again Cooper's friend. Inmate Gleason says that on the day he murdered inmate Cooper, he arranged with "some of the COs" for Gleason to go to the rec yard first. Gleason finds someone in the prison to make him a long braided necklace from sheets and snuck the necklace out through the shower room. JA 89 (Gleason).

13. Gleason secretly arranged for the braiding of the sheet. JA 89. (Gleason)

14. There was no "cookie trading" between defendant Mullins and Gleason. The allegation by Gleason of "cookie trading" was between Mullins and Cooper (Sparrow). The result of the "cookie trading" being that Cooper would stay in his cell. JA 90.

Gleason states it was standard operating procedure for guards to give cookies to the inmates if the inmates would stay in their cell and not have to be taken out to recreation. Gleason's deal was not for cookies. His deal was that he would stay in the cell ("Well, I told him I'd stay in plus other things") JA 91. (Gleason)

15. Gleason was able to get things he wanted inside the prison by doing things for his COs. Those things being he was given a bag of tobacco every week. JA 92. (Gleason).

16. Before Gleason went out to the recreation yard he was subjected to a search. When the officers, defendants Mullins and Meade gave Gleason back his clothes Gleason states that on the side he had a long sleeved burgundy shirt with a white shirt and the rope was in there. Yes the officers patted him down, but skipped right over the shirts. JA 93. (Gleason).

17. According to Gleason, Defendant Halsey was in the control booth when the incident was going on, JA 95-96. (Gleason).

18. Gleason had made a religious necklace for himself and asked inmate Cooper to sit down and let him place the necklace around Cooper's neck so that Gleason could mark the necklace. Gleason told Cooper that the religious necklace was going to be part of the story. The whole thing was to make it so Gleason could get the religious necklace around Cooper's neck. Gleason connived Cooper into believing that Gleason and Cooper were friends. And doing all of this was Gleason's idea. JA 97-98. Gleason came up with the "religious necklace" idea in

order to gain back Cooper's trust because Cooper knew Gleason was pissed off at Cooper. Cooper knew he had messed up. JA 102. (Gleason).

19. By getting the religious necklace out there on the rec yard Gleason would make the Department of Corrections look stupid because lots of the staff at Red Onion kept on saying "This is Red Onion, this ain't going to happen up here." JA 102. In a discussion with former defendant Major Tracy Ray and with unnamed staff Gleason agrees that no inmate, housed in segregation, had ever been killed at the Red Onion Prison. JA 102, 103. (Gleason)

20. Gleason asked Cooper to try on the necklace almost two weeks after Gleason and Cooper had their falling out. Gleason had the necklace made and a day or two after the necklace was made Gleason went outside and that's when he "had everybody come out." But Gleason had asked Cooper to try on the necklace "a few days before that." Cooper feared he would get in trouble for helping Gleason to "get a lawsuit going" by playing like he was being strangled by Gleason so he (Cooper) agreed to hold his breath so he would pass out so he would be able to  tell the authorities Gleason just tried to kill him knowing the statement was false. JA 104 (Gleason)

21. The story Gleason used on Cooper was first intended for another inmate, Derek Darden. JA 106, 108. (Gleason).

22. The placement of inmates on the rec yard is always different. JA 109. (Gleason).

23. The religious necklace was made by Derek Darden. JA 114, 115.

24. <u>A length of the braided rope was in the Cooper's pants when he was killed. JA 115. All the brothers tie their pants up so they don't drop down. JA 115</u>.  (Gleason)

25. Gleason thinks "they felt" something was going to happen to Cooper because when defendant Halsey opened up the control room window Gleason had the rope in his hands. And Gleason says that Halsey "could see it clear as day". He pulled up the rope and she shut the window and Gleason never saw her again. JA 118. (Gleason)

26.   On December 21, 2010, six months after the murder of Cooper, Gleason had made a statement in a Virginia state court hearing that he had to hurt one person, that he was sure that he was going to go down and kill another inmate, that he walked out to the rec cage and placed inmates where he wanted them with one inmate next to him. He

asked Cooper to put the religious necklace around his neck so that he Gleason could finish making the necklace. Gleason asked Cooper to sit on the ground so that he could see the necklace <u>because his eyes (Gleason's) "ain't that good as you can see now how I'm squinting."</u> JA 122,123. (Gleason). And see *Gleason v. Comm., 726 S.E. 2d 351, 352 (Va. 2012).*

27. Also on December 21, 2010 Gleason states to the Wise County Circuit Court Judge that he made Mullins (not Meade) come get him first and when Mullins brought Gleason out, Gleason went to the end cage <u>because he knew how the camera was angled</u>. JA 123-124. (Gleason).

28. No one of the defendants Tracy Baird, Brian Meade, Robert Mullins, or Heather Halsey knew of any plan by inmate Robert Gleason to harm inmate Aaron Cooper in any way. Nor did they know that inmate Robert Gleason was going to kill inmate Aaron Cooper. JA 129-136. Nor were any of these defendants involved in any conspiracy. JA 129-136. On July 28, 2010 Brian Meade and Robert Mullins conducted the required physical strip search of Robert Gleason before escorting Gleason to the recreation yard. Neither saw any braided noose. Nor did

either Brian Meade or Robert Mullins take any direction from inmate Gleason regarding placement of any of the inmates in the recreation yard on July 28, 2010. JA 131. (Defendants' Affidavits)

29. Heather Halsey suffers from full blown depression related to the Cooper murder. She had seen nothing like it in her life. She is the one who walked out and found Cooper, dead. She can still see it. JA 141. Ms. Halsey was hired in April 2008 as a correctional officer. The day of the incident she worked with Robert Mullins, Brian Meade, and Jamie Burke. Jamie Burke was in the control room. JA 142. Officer Halsey did give Officer Burke a break from the control room. When? She does not remember. JA 143. She did not see Gleason in his cage in the rec yard. Nor was she in the control room while Gleason was in the rec yard. JA 145. (Halsey)

30. After Officers Mullins and Meade took the guys out to the rec yard Officer Mullins went on break and Meae was calledto noter building, leaving Officer Halsey running three pods , a total of 88 inmates. JA 144. (Halsey)

13

31. Prior to the murder the corrections officers were never required to physically walk out into the rec yard. That changed after July 28, 2010. (Halsey)

32. Officer Halsey is a high school graduate with some college. Her husband has worked for the Department of Corrections in the Federal Prison in McDowell, West Virginia for over 20 years. JA 149. (Halsey)

33. Officer Halsey was told nothing about the background of Mr. Gleason nor what he had done to get to Red Onion. JA 146. (Halsey)

34. Inmate Gleason was talkative and friendly most of the time. Officer Halsey had no problems with Gleason who treated Halsey nicely and respectfully. Gleason, as all inmates, would ask for favors. For example, an extra tray, to move something from one cell to another, to get books. JA 151-152. (Halsey)

35. When new inmates came to Red Onion, Officer Halsey was never briefed on their medical conditions or issues. No one had ever told Officer Halsey anything about Mr. Gleason's personality traits or behavior in the past. Nor was she briefed on what Mr. Gleason or any other inmate was convicted for or what brought them into prison to start with. (Halsey)

36. Officer Halsey did not see Mullins or Meade taking inmate Gleason or Cooper to the rec yard. And she did not have the occasion to be in the control room and see them in the rec yard. JA 156. (Halsey)

37. We didn't let them pick, states officer Halsey. JA 157. (Halsey)

38. Officer Halsey had not been advised by her sergeant, lieutenant, or anyone else that there had been hints of something more serious than throwing feces planned for the rec yard. She did not know before inmate Cooper was murdered that Inmate Gleason had promised to kill again. JA 160. (Halsey)

39. Officer Halsey was the only Officer on the floor when Mr. Cooper was found. JA 161. (Halsey)

40. Halsey does remember giving Burke, the control room person, a break but doesn't know what time it was. She doesn't remember seeing Cooper or Gleason go into the rec yard. JA 164.  (Halsey)

41. It is the argument of the plaintiff that "the risk they were deliberately indifferent to was Mr. Gleason's promise to murder again." The plaintiff acknowledges that defendant officers Baird, Meade, Mullins, or Halsey were not notified by their superior Officer McCoy in any specific way of Gleason's promise to kill again, of his public

statements or the modus operandi Gleason used for the Watson murder. JA 172 S and 172 T. (Arguments before District Court)

42. According to the plaintiff it was not the defendant correctional officers who knew about Gleason's commitment to kill again. It was the senior officers, the supervisors, supervisors who gave no instructions to the on the ground officers about any particular concern about Inmate Gleason. There was no briefing from a superior of the fact that Gleason needed to be watched or needed to be of concern or that Gleason had made a recent threat. JA 172. AA. (Arguments before District Court)

43. Nowhere does inmate Gleason state in his deposition what trade he had with whom. Nowhere in the record does Gleason state as to any one of defendants Baird, Meade, Mullins, or Halsey that he was told "I will let you kill another inmate if you stay in your cell or do not take a shower today", or any other statement of similar import

44. Cooper voluntarily allowed a rope to be put around his neck. The plan of Gleason and Cooper was to make the Department of Corrections look stupid and thereby get a lawsuit going by allowing Gleason to place a religious necklace around Cooper's neck and almost kill Cooper. JA 102, 104. (Gleason)

16

45. Officer Tracy Gilmore Baird was a corrections officer through May of 2012. In 2010 she was a senior corrections officer. JA 178. (Baird)

46. As senior corrections officer she expected the persons in the control room to periodically monitor the rec yard. Usually they would walk around the control room and glance out at the rec yard. The sort of problems normally encountered in the rec yard before Mr. Cooper's murder between inmates would be throwing feces, throwing urine, or spitting on one another. On occasion inmates would try to stick implements or weapons through the links. JA 191-192. (Baird)

47. Officer Baird was on lunch break outside the institution when she received a call from Officer Halsey. JA 193.Officer Baird believes that it was Mr. Burke in the control room when the event occurred though she is not 100 percent sure. JA 200. (Baird)

48. Officer Baird had been at Red Onion for 13 years prior to the incident. The count was done on the day of the incident as it has always been done and the correction officer never stepped out on the rec yard to count inmates. JA 202. The count procedure changed after the Cooper murder. Now, when you are doing a count you are to step out on the rec

yard and count each individual in each cage. For thirteen years it wasn't like that. JA 206. (Baird)

49. The only information Officer Baird received about Mr. Gleason when he was sent to Red Onion was that Gleason had killed another inmate. That was the only information she got about Mr. Gleason. JA 207-208. (Baird)

50. Defendant Brian Paul Meade had worked at Red Onion for almost 12 years. He graduated high school and served four years in the Marine Corp. JA 222. On the day of the incident he was working with Officers Halsey, Mullins, Burke (in the control room), and maybe William Stanley. JA 224. Meade remembers inmate Cooper as being pretty quiet. He didn't cause any trouble or anything. Meade heard very little from Gleason and would occasionally talk to Gleason. Gleason was nice and polite but not overly polite. Gleason went out of his way to say yes sir, no sir, and thank you. Meade had no problems with Gleason. Meade never received a briefing on Gleason as an inmate; what he was like. The only thing they told him was that Gleason was brought to Red Onion for what he had done and that Gleason was a dangerous

individual. Meade was conscious of the fact that Gleason was dangerous but was never told that he was a murderer. JA 226-228. (Meade)

51. Meade and Mullins were the persons responsible on the day Cooper was murdered for "pulling inmates for rec". It was their normal assignment. JA 229. (Meade)

52. Inmates would usually choose their own cage. Meade and Mullins would generally just take them to whatever cage they went to. There was no policy or procedure at that time about where the officers were supposed to put the inmates. The inmates were allowed to stay in and not go out for recreation if they wanted to. The inmates had that option. JA 230-231. Showers were also optional. JA 232 (Meade)

53. The day Cooper was murdered Meade and Mullins "pulled" Gleason out and took him to the rec yard. JA 232-233.  But first there was a strip search at Gleason's cell. Meade searched Gleason's clothes and the clothes box. JA 233-234. Mullins found nothing. Mullins knows of no way that Gleason could have gotten a ligature of braided sheets from his cell to the rec yard. Mullins does not know how Gleason obtained his murder weapon. JA 235. (Meade)

54.  Meade knew nothing about the relationship between Gleason and Cooper. He did know that Gleason had killed an inmate Watson at Wallen's Ridge Prison. Meade had read nothing in the newspaper about what Gleason had done,  had not been advised that there was information that something more serious than throwing feces was expected to happen in the rec yard and, had not been told to maintain any sort of heightened awareness in the rec yard. JA 235-237. (Meade)

55. After placing the five inmates in the rec yard Officer Mullins went on break. Meade and Halsey were working the floor then Meade was called to D building to inventory some property leaving officer Halsey on the floor by herself. JA 238-239. (Meade) There is no evidence that Meade was not called to Building D.

56. Meade watched the video and didn't recall "any of them going, saying they wanted to go, or show them going here and there." Officers Meade and Mullins would "just open the door and they'd walk out to the cage." "When they came out, they … just walked out and went to the cage they wanted to go into." JA 244-245. (Meade)

57. Meade acknowledges most of the people who are in Red Onion are there because they are dangerous. JA 250. (Meade)

58. Once in the rec yard the inmates are locked in separate cages such that they cannot have access to each other. They are separated by a fence and locked in. They shouldn't be able to get to each other. JA 251. (Meade)

59. If Cooper had not leaned up against the fence and allowed Gleason to have access to him Cooper could not have been killed. JA 251. (Meade)

60. When Meade and Mullins took Mr. Cooper out to the rec area "there was only one cell left." JA 252. (Meade)

61. Defendant Robert A.C. Mullins graduated from high school and had eight years experience in the military. He was a combat engineer for the U.S. Army. He left the military in 2007. Currently Mr. Mullins is on long term disability because of nerves, stress, and PTSD. He worked at the Red Onion for approximately 3 years. Though his job at Red Onion is a part of his medical disability he had been treated since 2002 for PTSD, panic attacks, and stress. JA 255-261. (Mullins)

62. Gleason and Cooper were in a pod which consisted of 22 offenders (inmates). Each in a different cell, with no physical access to

each other, but they could communicate through their vents and doors. JA 267-268. (Mullins)

63. Cooper and Gleason were separated by six cells. Mullins was responsible on a daily basis for all three pods. Two, three or four people were responsible for everything in those three pods. JA 270-271. (Mullins)

64. There were four correctional officers on duty that day counting the control room officer, the officer who did not get on the floor or in the pods. The control officer is in the control room pushing buttons. JA 273. The control room officer was Jamie Burke. It was the control officer's responsibility to open the doors when the officers had the inmates handcuffed and leg irons on. The control officer was there for the protection of the officers, to help them, and to watch over us, and to watch over the officers on the floor. JA 274. (Mullins)

65. Officer Meade knew that Gleason was supposedly a Hell's Angel. From coworkers Meade learned about the Wallens Ridge incident. JA 283-284. Gleason had no reputation among the corrections officers at Red Onion. Gleason was always kind. He would always talk to you. JA 287. (Mullins)

22

66. The search of Cooper and the search and Gleason and the search of other inmates before they were permitted to go to the rec yard had two officers for each offender. The officer would go to the door of the inmate and ask the inmate to strip. All of their clothes were placed into a box. One officer would do a body search. The other officer would be searching the clothes that were in the box. The search was done at the cell of the inmate. After the clothes and the individual was search the clothes were given back to the inmate. The eyes don't come off the inmate. The inmate puts on clothes, turns around, and puts their hands behind their back. The officer handcuffs them then hollers for the control room officer to open up the door. The inmate is kneeling on his knees and that is when the second of the two officers puts on leg irons. They then help the inmate up and get him outside his cell. One officer walks through the cell; the other is outside patting down the inmate. Both officers continue to the rec yard. For Gleason and Cooper this would have meant a walk of about 50 feet and a necessity to go through two locked doors. JA 290-292. (Mullins)

67. Mullins after the incident had watched the video of the search and of the patting down and bringing Gleason out of his cell on the day of the incident and in the video does not see Gleason have anything during the search and patting down. Mullins had also seen the video of him standing with Gleason going into the rec yard and seeing only "me and Brian Meade escorting him into the rec cage." Mullins does not see the braided sheet that Gleason used to kill Cooper. Nor does Meade see Gleason holding his shirt before he, Mullins, goes into the rec yard. JA 292-293. (Mullins)

68. But Mullins  who was the person searching Gleason's clothes did see Gleason put his clothes back on after the search and was carrying his burgundy shirt, long sleeved, his outer shirt in his hands. The need for the shirt? To sit on. To do push-ups. JA 305. (Mullins)

69. Mullins believes that Mr. Gleason was the first to go to the rec yard but had no discussion with Gleason or any of the inmates. The door to the recreation yard was opened by a control room officer. Once in the yard the officers would lead the inmate into a cage. No specific cage. Each cage is locked even though no one is in it. The officers have a key to the pad lock of each cage. There was no specific cage where the

inmate was placed. There was no specific protocol in a line or anything of that sort. The officers were not taught otherwise. Basically Mullins would follow the inmates where they wanted to go and put them there. JA 294-298. (Mullins)

70.. No one of Mullins superiors came to his building and told him that there was some indication of an upcoming problem in the rec yard that he should watch for. JA 301. Mullins was not aware that Gleason had threatened and promised to kill another inmate or another person. Nor was he told the criminal record of Gleason. Neither Gleason nor Cooper ever caused a problem for Mullins. Never. JA 302-303. (Mullins)

71. Jamie Burke, not a defendant in this suit, was in the control room when Cooper was murdered because when Mr. Mullins came back in to the rec yard Mullins saw Burke in the control room plus Burke told Mullins that he, Burke, was in the control room. JA 309. (Mullins)

72. Where the control room is located there is a window that looks out on the rec yard but it is so high that if the inmates are in the back of the cage you can't see anything but just their feet. Through the window you can see the full cage but there's a roof that comes down and it is the roof that you see. If the inmates are up against the front of the cage you

25

can see their whole body but if the inmates go into the back, you can barely see their feet. There was no other way for the control room person to see the rec yard. JA 310-311. (Mullins)

73. Their superior, lieutenant McCoy, never told Mullins or his coworkers that there had been a recent threat that something far more serious than throwing feces was to happen. JA 313. Mr. Mullins has watched the video of the Cooper murder. It never occurred to Mr. Mullins that Gleason was capable of what he did to Mr. Cooper. None of Mullins' supervisors ever told Mullins that Mr. Gleason was a murderer and had promised to kill again. JA 315. (Mullins)

74. There is no video in evidence. JA 333 (fn 9).There was no live video at the time of the incident. JA 60.

75. Officer Halsey was written up by Red Onion for not having done a proper count. She was given Group 1 discipline for which she was suspended for a week without pay. Upon appeal the pay was reimbursed but the Group 1 designation remained on her record. Control Room Officer Jamie Burke was not disciplined. Officers Mullins and Meade also got the same suspension without pay and upon appeal got their money back. JA 148. Officer Baird was disciplined as a Group

2 with three days suspension without pay for failure to supervise her officers. Upon appeal the charge was reduced to Group 1 and she received her money back. JA 204. Officer Meade was disciplined for improper search. Meade was cleared of any wrong doing from an original Group 2 charge. JA 242-243. Officer Mullins received a Group 2 discipline and 8 hours of no pay. The discipline against Mr. Mullins was that he didn't search the clothes properly. JA 303-304.

76. All the original defendants in this case except current defendants Baird, Halsey, Meade, and Mullins have been dismissed as defendants in this suit at the request of the plaintiff.

77. Mr. Gleason is dead, having been executed by the Commonwealth of Virginia.

## Summary of Argument

This is a very unusual case where (a) there is affirmative evidence that a prison inmate, Mr. Cooper, brings cruel and unusual punishment upon himself and (b) where there is no significant, affirmative, probative, or concrete evidence that Mr. Cooper was incarcerated under conditions posing a substantial excessive risk of serious harm to him nor that the defendant prison officers knew that inmate Cooper was

being so incarcerated. The plaintiff attempts to push beyond this lack of significant, affirmative, and probative evidence by suggesting that there were available justifiable inferences which the Court did not consider, inferences depending upon the credibility of witnesses, credibility which the District Court should not have considered. That attempt collapses in the face of the rulings of *Anderson v. Liberty Lobby,* 477 U.S. 242 (1986) and *Farmer v. Brennan,* 511 U.S. 825 (1994). The lesson of both of these cases (*Anderson* by analogy)  being that in an Eighth Amendment cruel and unusual punishment case there must first be significant, affirmative, probative, and concrete evidence of the necessary elements of Cruel and Unusual punishment. There must be this "quantum and quality" of evidence made available to the Court or the jury before any inferences of knowledge of any such violation can be made. In this case there is no evidence that inmate Cooper was incarcerated under conditions posing a substantial/excessive risk of serious harm. Consequently and in addition there is no evidence that the defendant prison officers knew that inmate Cooper was being incarcerated under conditions posing a substantial/excessive risk of serious harm. And there being no such knowledge then there cannot be an argument that

the officers actually drew an inference that Cooper was in an excessive risk incarceration condition. A corollary consequence is that there was no conspiracy among the defendants to create an excessive risk condition for Mr. Cooper so there was no violation of the Eighth Amendment by these defendants.

Moreover, the facts in this case do not show the conduct of these defendants in this case to be a violation of clearly established statutory or constitutional rights of which a reasonable officer would have known. So there are two reasons for qualified immunity. The first being there is no Eighth Amendment violation and second the defendants have not violated any clearly established right under the law. Accordingly the defendants are entitled to qualified immunity.

## ARGUMENT

### A.

### Summary Judgment Requirements

Plaintiff Strickland bases her Appeal on evidence that is not in the record, claiming that justifiable inferences from evidence that is in the record were ignored by the District Court and that the District Court made credibility of witness determinations not within his right to make-

--all having to do what Strickland defines as the "state of mind" requirement of a Eighth Amendment violation. Opening Brief (OB) at pages 18-36.

The cases that Strickland cites in support of her claims of ignored justifiable inferences and improper credibility of witness determinations are (1) three contract "meeting of the minds cases". *Charbonnages De France v. Smith,* 597 F.2d 406 (4th Cir. 1979), *Empire Electronics Co. v. United States,* 311 F.2d 175 (2d Cir. 1962) , and *Thompson v. ALCOA, 276 F.3d 651* (4th Cir. 2002); (2) a simple negligence case, *Croley v. Matson Navigation Co.,* 434 F.2d 73 (5th Cir. 1971); (3) a racial gerrymandering case, *Hunt v. Cromartie,* 526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed. 2d 731 (1999); (4) a case under the 1994 Driver's Privacy Protection Act, *Maracich v. Spears,* 675 F.3d 281 (4th Cir. 2012) and (5) a civil rights case that defendant failed to cash plaintiff's check because of the plaintiff's race *Williams v. Staples, Inc.,* 372 F.3d 662 (4th Cir. 2004).

No one of these cases addresses what a judge must consider in making a summary judgment decision in a case where the plaintiff must prove (a) incarceration under conditions posing a substantial risk

of serious harm and (b) actual knowledge of (a), and (c) that the defendant disregarded both (a) and (b).

It is the cases of *Farmer v. Brennan,* 511 U.S. 825 (1994) and *Anderson v. Liberty Lobby,* 477 U.S. 242 (1986) which set out guidelines for summary judgment in a case like this one before the Court where actual knowledge is a required element of the plaintiff's claim.

*Anderson* is a case about actual malice, a claim that had to be proved with "convincing clarity." The respondent in *Anderson* argued, just as does plaintiff Strickland here,  that "the defendant should seldom if ever be granted summary judgment when his state of mind is an issue and a jury might disbelieve him or his witnesses as to that issue. *Id.* at 256.

The Court in *Anderson* responded by stating that a properly supported Motion for Summary Judgment in a conspiracy or libel case cannot be defeated without the nonmoving party offering <u>any concrete evidence</u> from which a reasonable juror can return a verdict for thenon-moving party and by <u>merely asserting that the jury might, and legally could, disbelieve the defendant's denial</u> of a conspiracy or of legal malice. *Id.* at 256. (Emphasis added)

The *Anderson Court* continues that the non-moving party is not relieved of his/her own burden of producing evidence that would support a jury verdict. The evidence must be more than mere allegations or denials. The response must set forth specific facts showing there is a "genuine issue" for trial. A properly supported summary judgment motion will not be defeated without the non-moving party producing significant, affirmative, and probative evidence and this is true even if the affirmative, probative evidence is within the possession of the moving party so long as the non-moving party (the plaintiff Strickland here) has full opportunity to conduct discovery (which the plaintiff did in this case). *Id. at 256-257.*

The major holding in *Anderson* is that the determination of whether a factual dispute requires submission to a jury must be guided by the quantum and quality of proof necessary to support liability. *Id.* at 254,which in the *Anderson* case was the substantive evidentiary standards of clear and convincing evidence. *Id.* at 255.

So in this case, by analogy to the *Anderson* case, the plaintiff Strickland must in this case present to the Court specific, significant, affirmative, probative and concrete evidence of the elements of the cruel

and unusual punishment Eighth Amendment violation she claims. It is this "quantum and quality" of evidence that precedes and must be available for the Court or the jury to make inferences.

It should also be remembered that this is a case where the defense of qualified immunity has been raised. And in the arena of qualified immunity , summary judgment, when properly supported is encouraged. Qualified immunity is an issue for a Court and not a jury to determine. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).

B.

**The Quantum and Quality of Proof, the Significant, Affirmative, and Probative, and Concrete Evidence Necessary for the Plaintiff to Defeat the Defendants' Motion for Summary Judgment**

1.

**The Plaintiff Must First Show That Inmate Cooper Was Incarcerated Under Conditions Posing a Substantial, Excessive Risk of Serious Harm**

This case is governed by the U.S. Supreme Court case of *Farmer v. Brennan,* 511 U.S. 825 (1994) and by the Fourth Circuit case of *Odum v. S.C. Dept. of Corrections,* 349 F.3d 765 (4th Cir. 2003).

*Farmer,* an inmate in a federal penitentiary on the charge of credit card fraud had been diagnosed by medical personnel of the

33

Bureau of Prisons as a transsexual. Farmer, approximately 18 years old, was sometimes in the general male prison population but more often in segregation. In March 1989, Farmer was transferred for disciplinary reasons from the Correctional Institute in Oxford, Wisconsin to the U.S. Penitentiary in Terre Haute, Indiana, a prison that houses more troubled prisoners than a federal correctional institute. After an initial stay in administrative segregation at Terre Haute, Farmer was placed in the Terre Haute prison general population. Within two weeks after the move to general population Farmer was beaten and raped by another inmate in Farmer's cell. Several days later prison officials returned Farmer to segregation. Inmate Farmer in an Amended Complaint alleged that the defendant senior officials transferred Farmer to the Terre Haute penitentiary or placed Farmer in the general population of the Terre Haute Penitentiary despite knowledge that the Terre Haute penitentiary had a violent environment and a history of inmate assaults and despite knowledge that Farmer as a transsexual, projecting feminine characteristics, would be particularly vulnerable to sexual attack by Terre Haute Penitentiary inmates. *Id.* at 828-831.

Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Id.* at 833. For a claim based on failure to prevent harm the inmate must first show that "<u>he is incarcerated under conditions</u> posing a substantial risk of serious harm," *Id.* at 834, an "excessive risk" to his safety. *Id.* at 837. As "<u>only the unnecessary and wanton infliction of pain implicates the Eighth Amendment</u>". *Id.* at 834. (Emphasis added)

There is no evidence that the incarceration of inmate Cooper at Red Onion was under conditions posing a substantial, excessive risk harm to Cooper. The details of the conditions of Mr. Cooper's incarceration at Red Onion are these:

1. Mr. Cooper was 26 years old and serving a total active sentence just in excess of 34 years. Inmate Cooper was housed in the same pod which consisted of 22 inmates (offenders). Each was in a different cell with no access to each other. Cooper and Gleason were separated by six cells. See Statement of Facts 1, 62, and 63.

2. Inmate Gleason had murdered his cellmate Harvey Watson, Jr. at Wallens Ridge State Prison prior to coming to Red Onion Prison. Fact 2.

35

3. On or about July 14, 2010 former defendants in this case. Rick Wiandt, Sergeant Tony Adams, and corrections officer James Bentley were present during an interview of offender Martin Rogers about an unrelated event at a different prison. During that interview Rogers had stated that something serious was going to happen on the recreation yard but Rogers gave no details about what or when. Another meeting with Rogers occurred on or about July 16, 2010 at which Rogers was asked about the statements he had made on or about July 14 that something was going to happen in the rec yard. Rogers said that he didn't know anything more than what he had said on July 14 and refused to provide any further information. Former defendant James Bentley remembers that he reported Rogers' statement to watch commander Lieutenant McCoy, also a former defendant in this case. JA 68-69. Former defendant Sergeant, Tony Adams, remembers Martin Rogers did not elaborate on the date, time or parties that would be involved and gave no details or specifics about what he knew and how knew it. JA 65-66.

4.  Gleason did indicate that he would kill other inmates and already had a few other inmates lined up. But this comment was made

in a court appearance on December 21, 2010, one week less than some five months after Cooper had been killed. Facts 26 and 27 and 10.

5. No inmate housed in segregation had ever been killed at the Red Onion Prison. Fact 19.

6. According to Gleason it was standard operating procedure for guards to give cookies to the inmates so the inmates would stay in their cell and not have to be taken out by the officers to recreation or shower. Fact 14.

7. Inmate Gleason was talkative and friendly. The defendants in this case had no problems with inmate Gleason. Fact 34. Inmate Cooper was quiet and caused no trouble. Fact 50. Gleason was nice and polite but not overly polite. Gleason went out of his way to say yes sir, no sir, and thank you. Fact 50.

8. Inmates would usually choose their own cage. The inmates were allowed to stay in and not go for recreation or showers. It was their option. Fact 52. There is no evidence in the record that anyone, including the supervisors, now dismissed defendants, knew anything about any relationship between inmates Gleason and Cooper.

9. Most people who are in Red Onion are there because they are dangerous. Fact 57.

10. Rec yard inmates are locked in separate cages such that they cannot have access to each other. They are separated by a fence and locked in. Fact 58.

11. If Cooper had not leaned up against the fence between the cages and allowed Gleason to have access to him, Cooper could not have been killed. Fact 59. Each inmate who goes from his cell to the rec yard is subjected to a search conducted by two officers. Fact 66.

12. After the search of Gleason's clothes, Gleason put his clothes back on and was carrying his long sleeved burgundy shirt, his outer shirt in his hands. Fact 68. According the Gleason, officers Mullins and Meade conducted the search but skipped right over the rope which Gleason said was in that shirt. Fact 16.

13. A length of the braided rope used to kill Cooper was in Cooper's pants when he was killed. Why? Because, said Gleason, all the brothers tie their pants up so that they don't drop down. Fact 24.

14. Prior to the murder of Mr. Cooper, corrections officers were never required to physically walk out to into the rec yard. Fact 31.

15. Though Gleason talks about trading cookies, nowhere in the record is there evidence that Gleason stated that any of the former defendants or any of the present defendants in this case said that "I will let you kill another inmate if you stay in your cell or do not take a shower or any other statements of similar import." Fact 43.

16. Nowhere in the record is there any indication that Mr. Cooper had made any complaint about his treatment or being in fear of his safety as between he and Gleason and himself and anyone else.

17. There is no evidence in the record of any conversation between or among defendants Meade, Mullins, Halsey, and Baird as to killing or otherwise harming Mr. Cooper.

18. Gleason in his deposition talks about officers Mullins and Meade not finding the rope in his shirt (they just didn't see it?) Fact 16. Gleason did not say that officers Meade or Mullins knew he had the rope; nor that he told them he had the rope.

19. According to Gleason, Ms. Halsey is the only person who "could see". JA 120.   See what? For Gleason also says that he chose the end cage "because he knew how the camera was angled". Fact27. Officer

39

Mullins described what in fact you could see from the control room as to the cages in question. Answer: The inmate's feet. Fact 72.

20. As soon as Mullins released Gleason into the rec cage he went to lunch break in the parking lot. JA 276. Officer Meade was called to a different building at the same time, Fact 55. This left Halsey on the floor. She couldn't have been in the control room as she was the only person left on the floor. Fact 39.

21. There is no evidence from Gleason that Halsey while she was in the control room doing a break of Burke saw (a) what was going on between Gleason and Cooper and/or (b) that officer Haley could and did see Gleason tying the rope around Cooper's neck and strangling Cooper with the rope.

25. Inmate Cooper knew that inmate Gleason was going to put a rope around his neck and that he was supposed to hold his breath so he would pass out. He knew that he had messed up with Gleason and that Gleason was upset with him. He had had the necklace rope twice put around his neck. He was agreeing to the plan to embarrass the Department of Corrections and enable Gleason to bring a suit in order to appease Gleason. And the second time the rope was put around his

40

neck, July 28, 2010, a part of which rope was in his, Cooper's pants. Cooper's last words according to Gleason were, "Please don't kill me." JA 98. Facts 11,12,18-20,24,44. Though these facts are from the mouth of Gleason there is nothing in the record to indicate that these facts are inaccurate.

For all of which reasons the defendants assert that there is no significant, affirmative, probative and concrete evidence that Cooper was incarcerated under conditions of substantive/excessive risks that he would be seriously injured or killed.

Contrast the case cited by the plaintiff of *Odum v. S.C. Dept. of Corrections,* 349 F.3d 765 (4th Cir. 2003), a case that clearly demonstrates the "quantum and quality" of proof, the specific affirmative, probative, and concrete evidence of an Eighth Amendment violation necessary for the plaintiff to prevail in her appeal of the summary judgment determination dismissing her case.

In *Odum* the only testimony was that of the plaintiff. The defendant guards made no response whatsoever. The Court ruled that where the plaintiff *Odum's* testimony (not Odum himself) is "credible and uncontradicted his testimony would be accepted". That testimony

by Odum was that a fellow inmate started a fire in order to create an opportunity to attack Odum. Odum warned one of the defendants that a group of fellow inmates would kill him if he was put in an area where they would get access to him. Then several inmates demanded that another one of the defendant correctional officers put them in Odum's cage. The other inmates were put in an adjoining cage but immediately began tearing down the fence. Odum pleaded to be removed from the cage. Odum begged the defendants to let him out of the cage. In fact senior officers told the defendants to get Odum out of the cage, an order the defendants ignored. More than once Odum told the officers a group of inmates intended to harm him. When one of the officers did approach, one of the inmates took a piece of the chain link fence out of his pocket and threatened the officer. The officer did nothing. At 10:00 P.M. several inmates from the adjoining cage destroyed enough of the fence to climb into Odum's cage and brutally attack Odum. *Id.* at 767-769 and 774. [2]

---

[2] In the *Farmer* case the Supreme Court remanded the case back to the appellate court to allow Farmer to flesh out his evidence supported assertions that there was a high probability that he would not be safe at the Terre Haute Prison because his was transsexual, young, and a feminine appearance, that the Terre Haute Penitentiary was a violent

2.

**The Plaintiff Must Show that the Defendant Prison Officers Knew that Inmate Cooper was Being Incarcerated under Conditions Posing a Substantial/ Excessive Risk of Serious Harm**

The inmate must also show that a prison official has a sufficiently "culpable state of mind". In prison conditions cases that state of mind is one of safety. *Farmer,* Id. at 834.

Courts of Appeals, including the Fourth Circuit, had before *Farmer* routinely equated indifference with recklessness. *Id.* at 836. But the question before the Court in *Farmer* was whether to define deliberate indifference as a civil law recklessness or to define deliberate indifference consistent with recklessness in a criminal law. The Supreme Court concluded that prison officials cannot be found liable under the Eighth Amendment for denying the inmate humane

---

institution with a history of sexual assault, and that Farmer should not have been sent to Terre Haute and placed in general population. *Id.* at 848-849.

Contrast this case where the is no evidence that there was a high probability that if Cooper was placed next to Gleason in a segregated recreation cage there would be a substantial risk he would be assaulted killed. Nor is there evidence that the Red Onion Facility was a violent institution with a history of inmates being assaulted and/or killed in the segregated recreation area cages.

conditions of confinement unless the official <u>knows of and disregards an excessive risk</u> to inmate safety. The official must both be aware of facts from which the <u>inference could be drawn that a substantial risk of serious harm exists,</u> <u>and he must also draw the inference</u>. *Id.* at 837. (Emphasis added) The Eighth Amendment outlaws Cruel and Unusual punishments. An act or omission not accompanied by knowledge of a significant risk of harm is not a violation of the Eighth Amendment; nor is a failure to alleviate a significant risk that the officer should have perceived but did not.

When it is claimed that the prison official has inflicted cruel and unusual punishment the cases mandate an inquiry into a prison officials' state of mind, a subjective requirement. *Id.* at 838.

The inmate must show that the prison official consciously disregarded a substantial risk of serious harm. *Id.* at 839. Even if the risk was obvious and a reasonable prison official would have noticed it, there is no Eighth Amendment liability if the jail official being sued was him or herself unaware of the substantial risk of harm to that inmate. *Id.* at 842.

The subjective, actual knowledge of excessive risk to the safety of an inmate can be established by inference from circumstantial evidence. But the circumstantial evidence leading to the inference requires that the prison officer had been exposed to the specific information concerning the specific risk. The Supreme Court in *Farmer* fleshes out this part of its ruling with the following example, an example very relevant to the decision the Fourth Circuit will be making in this case before it:

> *For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "long standing, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk. Id.* at 842-843.

*Farmer* teaches us that for there to be justifiable reasonable inferences in a Cruel and Unusual punishment case like the case presently before this Court,  the prison officers must have actual knowledge that an inmate was incarcerated under conditions posing a substantially/excessive risk of serious harm. There must be a quantum and quality of evidence that the incarceration was under conditions

posing substantial risks of serious harm equivalent to there being longstanding, pervasive, well documented or expressly noted by prison officials---notice to the prison officers---of the substantial/excessive risk. Deliberate indifference is a very high standard. *Grayson v. Peed,* 195 F.3d 692, 695 (4th Cir. 1999). In the Eighth Amendment context it is charging the prison officer with punishing an inmate.

Defendants Baird, Halsey, Meade, and Mullins had no knowledge directly or by inference that inmate Cooper was being incarcerated under conditions posing a substantial risk of serious harm, namely that Cooper or any other inmate was going to be killed or seriously injured by Gleason in the segregated recreation cage area of the prison.

The reasons for this conclusion and assertion are these:

1. At no time did Gleason or anyone else mention Cooper to the defendants or state that Gleason was going, or had threatened, to kill or otherwise seriously injure Cooper. Facts 10, 28, 35, 38, 41, 42, 49, 50, 54 , 65, 70, 73.

2. The now dismissed defendants in this case who admitted that they had received a rumor from an inmate that something serious is going to happen in the rec yard at Red Onion Prison, those persons have

been dismissed as defendants in this case. Fourth Circuit Order dated August 6, 2014.

3. Unlike the *Farmer* and the *Odum* cases there is in this case no evidence showing that a substantial risk of inmate attack was long standing, pervasive, well documented, or expressly noted by a prison official in the past. There is no evidence that any one of the defendants presently before this court had been exposed to any notice concerning the risk that inmate Cooper or some other inmate in the rec yard was going to be killed or otherwise injured in his segregated cage. Without such evidence there can be no inference sufficient to permit a trier of fact to find that the defendant officers in this case had actual knowledge of the risk that Mr. Cooper or any other inmate was going to be killed or otherwise injured by Gleason in their segregated rec area cages.

3.

### The Plaintiff Must Show Evidence that the Defendant Prison Officers Actually Drew the Inference that Cooper was in an Excessive Risk Incarceration Condition

Even if (a) there is evidence that the inmate is incarcerated where there is a longstanding, pervasive and well documented or expressly noted excessive risk to his safety and if (b)  the defendant prison officer

being sued had been exposed to the information concerning this excessive risk condition allowing the inference that the prison official had actual knowledge, of the excessive risk condition,  there must  (c) also be evidence that the prison officer actually drew the inference that the inmate was in an excessive risk condition. A prison officer who lacks knowledge of the excessive risk condition cannot be said to have inflicted punishment. *Farmer, Id.* at 837, 842-844. So if the prison officers did not know the facts from which an inference of a condition of excessive risk can be gleaned, such that they were unaware of the excessive risk danger to the inmate, then there is no violation of the Eighth Amendment. *Id. at 844.*

Such are the facts here. Facts 10, 28, 35, 38, 41, 42, 49, 50, 54 , 65, 70, and 73.

4.

## Even Obviousness of Prison's Excessive Risk Condition is Not Conclusive of An Eighth Amendment Violation

Even the obviousness of a prison's condition of excessive risk is not conclusive of an Eighth Amendment violation and a prison officer may show that the obvious  escaped him. That defense is sufficient to defeat a claim of Eighth Amendment violation unless the evidence would

should show that the officer (a) refused to verify underlying facts <u>that he strongly suspected to be true</u> or (b) declined to confirm inferences of risk <u>that he strongly suspected to exist</u>, as when a prison officer is <u>aware of a high probability</u> of facts indicating that one prisoner has planned an attack on another, but resists opportunities to obtain final confirmation. *Farmer, Id.* at footnote 9. This footnote from *Farmer* underlines the quantum and quality of evidence necessary to prevail in a cruel and unusual punishment case.

## C.

## Conspiracy

Plaintiff also alleges a conspiracy (JA 28). The plaintiff has a weighty burden to establish a civil rights conspiracy. The plaintiff must present specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective. And to survive a Summary Judgment Motion the plaintiff's evidence must reasonably lead to the inference that the remaining defendants in this case (Baird, Meade, Mullins, and Halsey) positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan. *Hinkle v. City of Clarksburg*, W. Va. 81 F.3d 416, 421 (4th Cir.

1996). The same common and unlawful plan in this case would be to assist inmate Gleason in killing inmate Cooper.

Beginning about 12.39pm, lunchtime, both Gleason and Cooper were each in an adjoining segregated cage. Fact 3. Officer Meade had been called to a different Building. Fact 55. Officer Mullins was having lunch. JA 281. As was Officer Baird. Fact 47. Non-defendant Burke was in the control room except for his break when officer Halsey was in the control room. Otherwise Halsey was on the floor in the pod. Facts 29,30,36. This evidence is capable of an innocent interpretation. There is nothing from these facts that reveals that any of the defendants possessed an intent to help Gleason kill Cooper.

Speculation or guessing, "the piling of inferences", is not the type of evidence necessary to show conspiracy. *Id.* at 422-423. Evidence capable of innocent interpretation as the evidence set forth in the prior paragraph is not evidence of conspiracy. There is just no evidence that reveals that any member of the alleged conspiracy possessed an intent to commit the unlawful objective of killing Cooper. The defendants respectfully submit that the plaintiff's conspiracy claim is only

speculation based on inferences not supported by the concrete actual facts of this case.

D.

**There is No Evidence to Support Plaintiff's Assertions**

The plaintiff in her argument sets out allegations of facts which are not facts in this case and allegations of facts which the plaintiff admits were not known to the current defendants in this case. For example:

1. There is no evidence of danger and disease exposing behavior and physical attacks being long standing risks in the rec yard noted by Sergeant Baird (plaintiff's Opening Brief (OB) at 25). The evidence at JA 121 is that Ms. Baird indicated all sorts of problems where encountered in the rec yard. For example throwing feces and urine and spitting on one another and on occasion attempting to stick an implement or weapon through the links. JA 191-192.

2. The plaintiff suggests that Cooper belonged to an identifiable group frequently signaled out for violent attacks and that the fact that he was biracial facilitated Gleason's plan. (OB at 25) The question to Gleason was whether there was some CO's sentiment that disliked

Cooper. The answer was "him and Halsey". Gleason was then asked whether they helped him because of expressions from them against Cooper. Gleason doesn't answer the question JA 117-118.

3. The plaintiff sets out facts that the defendant guards acted with deliberate indifference because they knew of Gleason's very recent homicide, his plea for execution, and threat to kill. (OB at 26). Yes, most of the defendants knew that an inmate Watson had been killed by Gleason at a previous prison. But there is no evidence that any of the defendants knew about a plea for, execution or a continuing threat to kill. See Facts 10, 28, 35, 38, 41, 42, 49, 50, 54 , 65, 70, 73.

4. There is no evidence that defendant Meade had been advised by a superior that Gleason was "especially" dangerous. See JA 228.

5. The plaintiff argues that the weapon made from bed sheets was known to all the world as the most accessible weapon to inmates, frequently used to commit homicide or suicide. (OB 27). There is no evidence of this statement in the record.

6. Plaintiff says that inmates in the rec yard regularly created serious dangers and objective risk of harms to others. Not only do the facts show that the remaining defendants in this case did not have

knowledge of conditions that presented inmate Cooper with the threat of being injured or killed. Plaintiff agreed that this lack of knowledge was indeed the case. It is plaintiff's argument that this knowledge was held by the supervisors of the remaining defendants, not the remaining defendants themselves. See Facts 41 and 42.

7. Plaintiff asserts that the District Court discounted Mr. Gleason's affirmative statement that Officer Halsey was looking up into the rec yard from the control room window when he arrived on the rec yard and held up his braided sheets "for her to see…" (OB 29). What Gleason actually said was that he had the rope in his hand when he came to the rec yard, that she looked down and "She could see it clear as day." JA 118. This is mere speculation. How does/could Gleason know what Halsey saw? Moreover, Halsey stated that Gleason was not in the rec area while she was in the control room nor does she remember seeing Gleason until she went out into the rec yard and found Mr. Cooper. JA 145, 161.

8. At the Summary Judgment stage the nonmoving party must come forward with more than mere speculation of the building of one inference upon another to resist dismissal of an action. *Perry v. Kappos*,

Case No. 11-1476 (4th Cir. 2012) at page 9. The plaintiff in this case is basing her case on ungrounded speculation and suggested inferences. Inferences are permissible but not if there is no underlying significant affirmative, probative and concrete evidence justifying the inference.

9. Consequently the seven questions set out in the plaintiff's Brief at pages 29 and 30 do not present disputed genuine and material issues to be decided by the fact finder. Questions numbered 2, 3, 4, 5 are questions. They are not inferences. As to question 1, Mr. Gleason did not testify as to any specific trade made with any of the defendants nor did he testify that he had told any of the defendants that the rope was a weapon. In fact he stated that a part of the rope he used to strangle Cooper was in Cooper's pants and that all the brothers used such a rope to hold up their pants. What did Gleason say any of the Defendants was to get in return? Gleason did not address this question.

10. A video showing Gleason carrying a shirt or cloth behind his back to the rec area is certainly not a justifiable inference that any of the defendants knew the rope was in the shirt. (OB 29, 30) The plaintiff suggests that the rope was in the shirt because the rope had not been taken from him when he was searched. The inference being that the

officers intentionally didn't take it. And then the plaintiff says there should be an inference that the officers allowed the weapon to get to the floor because it couldn't have been obtained in any other way. This is in the face of the admission of Gleason that a segment of the rope was in Cooper's pants!  Fact 24.Speculation and inference upon inference is not acceptable. *Perry v. Kappos*, *Id.*.

11. As to question 3 (OB 29) the rec yard  videocamera was not live. There is no evidence that the site of the murder was visible to any onlooker or viewer from the control room. The evidence is that the view from the control room to the location of the incident was limited to the feet of an inmate. Fact 72. The plaintiff is again asking that speculation become an inference.

12. As to paragraph 4 (OB 30) there is no evidence that the incident between inmates Cooper and Gleason was in fact seen by anyone from the control room. And the evidence is that it could not have been seen because of the roof over the individual cages. As to paragraph 5 an argument might be made that the discipline of the defendants indicated negligence on their part. There is certainly no inference of deliberate indifference.

13. Contrary to the suggestion of question 6 (OB 30), placing a prisoner who has killed another prisoner in another prison in a separate segregated cage (and not with others in the cage) does not constitute known reckless indifference.

14. In the answer to question number 7, the evidence, the record, in this case does not permit a reasonable juror to find for the plaintiff.

E.

## Cruel and Unusual Self-Punishment

This is a very unusual case where the evidence in the record makes clear that the defendant decedent Mr. Cooper brought cruel and unusual punishment on himself. See Facts 11, 12, 18-20, 24, 44. And see JA 98. And see paragraph 25 on page 40 of this, the defendant's responsive brief. It is not fair or reasonable for these defendants to be held responsible for cruel and unusual punishment of Mr. Cooper who himself invited the probability of cruel and unusual punishment by Gleason on himself. The Facts referred to above establish at least contributory negligence and arguably assumption of risk. By stating to Gleason, as his last words, according to Gleason, "Please don't kill me," it is clear that Cooper knew or should have known, since Cooper did

know that Gleason was upset with him…that Gleason very well could and would kill him. If he was only careless then he, Cooper is guilty of contributory negligence but if his act was "ventureousness", Mr. Cooper was guilty of assumption of risk. These are Virginia definitions of the terms. *Arndt v. Russillo*, 343 S.E. 2d 84, 231 Va. 328 (Va. 1986) at pages 86 and 88. And the Fourth Circuit has applied the Virginia definitions of contributory negligence and assumption of risk in a case about excessive force in violation of the Fourth Amendment under 42 U.S.C. §1983 and battery and gross negligence under Virginia law. *See Johnson v. Rankin,* Case No. 12-1414 decided on December 2, 2013, 4th Cir. (2013). This Fourth Circuit case makes reference to the Virginia *Russillo* case at page 10.

So at the least the defendants submit that the Court must in making a summary judgment decision use this evidence of Cooper's role in bringing about his own demise in determining whether in fact there is any evidence that these defendants deliberately, intentionally, on their own together punished Mr. Cooper. The answer is no.

# F.

## Qualified Immunity

The District Court addressed the defendants' defense of qualified immunity. And in determining that defense there were two available prongs. First, whether a constitutional right had been violated and second whether that right was clearly established at the time of the violation. The Court chose to make the initial prong determination and did so correctly. JA 330.

Had the Court decided to determine the case on the second prong, clearly established right, the result in favor of the defendants would be the same. Not only do the facts and the law in the *Farmer* case give qualified immunity protection to the defendants but also the more recent Fourth Circuit cases. See *Parrish Ex rel Lee v. Cleveland*, 372 F.3d 294 (4th Cir. 2004); *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999).

The defendants in this case are entitled to qualified immunity. First because there is no constitutional line they crossed and second there was no law preventing their conduct. Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Malley v. Briggs,* 475 U.S. 335, 341 (1986). Qualified immunity protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only for transgressing bright lines. *Maciariello v. Summer,* 973 F.2d 295, 298 (4th Cir. 1992). Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "conduct does not violate clearly established, statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) and see *Short v. Smoot*, 436 F.3d 422, 426-427 (4th Cir. 2006).

There is/was no established law that it is deliberate indifference to a substantial/ excessive risk that an inmate was going to kill another inmate when each inmate is housed in the prison in separate cells, six cells apart, and are brought separately after a strip search to a segregated metal caged recreation area, with one of the two inmates choosing the next to last cage and leaving the other inmate to choose the remaining last cage, the prison officers knowing that both prisoners could be very dangerous but having no experience of seeing that dangerousness and having no knowledge of any threat in the prison by

either inmate, and having no knowledge of any rumor that something serious was going to happen in the rec area, none of the officers being advised by either of the two inmates or anyone else of any plan by one inmate to kill or seriously injure the other, there being no indication that that was going to happen, and where the most that can be said (and as to only one defendant) is that there was allegedly a rope brought in to the cage by the inmate who wound up strangling an inmate housed in a separate adjacent cage, a rope a part of which was found in the pants not of the inmate who strangled the inmate in the adjoining case but in the pants of the inmate who allowed himself to have the rope placed through the cage mesh steel and around his neck. There is no law that makes this conduct deliberate indifference or even can be said to infer deliberate indifference.

## Conclusion

District Court Judge Jones was correct in his decision for the reasons set forth in his Opinion and Order and his decision should be upheld both for the reasons set forth in his Opinion and for the additional reasons set forth in this Brief. The defendants so move.

HEATHER L. HALSEY

TRACY C. BAIRD (FORMERLY GILMORE)

BRIAN P. MEADE

ROBERT A. MULLINS

By:/s/ Henry S. Keuling-Stout

Henry S. Keuling-Stout, Esq. (VSB# 15289)
Keuling-Stout, P.C.
125 Clinton Avenue East
P.O. Box 400
Big Stone Gap, Virginia 24219
Tel:   276-523-1676
Fax:   276-523-1608
keulingstout@gmail.com
Counsel for Defendants-Appellees

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This brief complies with the Type-volume limitation of Fed. R. App.
P. 32(a)(7)(B) because:

The word count of this brief is <u>12,244.</u>

2.  This brief complies with the typeface requirements of Fed. R. App.
P. 32(a)(5) and the type style requirements of Fed. R. App. P.
32(a)(6) because:

This brief has been prepared in a proportionally spaced
typeface using:

<u>Micro Soft Word, Century Schoolbook, 14 point font.</u>

September 3, 2014

/s/ <u>Henry S. Keuling-Stout</u>
Henry S. Keuling-Stout

## Certificate of Filing and Service

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this September 3, 2014, filed the required copies of the foregoing Brief of Appellees in the Office of the Clerk of the Court, via hand delivery and have electronically filed the Brief of Appellees using the Court's CM/ECF system which will send notification of such filing to the following counsel:

Mary Lynn Tate
Tate Law Firm
16006 Porterfield Hwy,
Abingdon, VA 24210
mltate@tatelaw.com

Trever Stephen Cox
Office of the Attorney General
900 East Main Street
Richmond, VA 23219-0000
tcox@oag.state.va.us

Cameron Scott Bell
PENNSTUART
208 East Main Street
P.O. Box 2288
Abingdon, VA 24212-2288
cbell@pennstuart.com

/s/Henry Keuling-Stout